UNITED STATES of America, Appellee,

v.

**Pedro MORENO, Carlos Libreros, Defendants–Appellants.**

**Nos. 1310, 1311, Dockets 89–1001, 89–1083.**

United States Court of Appeals, Second Circuit.

Argued June 21, 1989.

Decided Feb. 12, 1990.

---

Rene A. Sotorrio, Coconut Grove, Fla., for defendant-appellant Pedro Moreno.

Louis M. Freeman, New York City (Freeman, Nooter & Ginsberg, New York City, of counsel), for defendant-appellant Carlos Libreros.

Daniel F. DeVita, Asst. U.S. Atty., for the E.D. of New York, Brooklyn (Andrew J. Maloney, U.S. Atty., for the E.D. of New York, Matthew E. Fishbein, Asst. U.S. Atty., for the E.D. of New York, Brooklyn, of counsel), for appellee.

Before MESKILL, PIERCE and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendants-appellants Pedro Moreno and Carlos Libreros appeal from judgments of conviction entered by the United States

District Court for the Eastern District of New York, Leonard D. Wexler, *Judge*, on December 5, 1988 and February 1, 1989 after a jury found defendants guilty of conspiracy to possess with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. §§ 846 (1982) and 841(b)(1)(B)(ii)(II) (1982 & Supp. V 1987), and possession with intent to distribute of more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) (1982) and 841(b)-(1)(B)(ii)(II) (1982 & Supp. V 1987). Libreros was also convicted of assaulting a DEA agent in violation of 18 U.S.C.A. § 111 (West 1969 & Supp. 1989). Defendants were sentenced on each narcotics count to concurrent five-year prison terms, to be followed by four-year terms of supervised release. Libreros was also sentenced to three years probation on the assault count, to be served subsequent to imprisonment. Special assessments were imposed in accordance with 18 U.S.C. § 3013 (Supp. V 1987).

On this appeal, we consider primarily whether defendants' motions to suppress evidence, which were denied at a pretrial suppression hearing by Chief Judge Thomas C. Platt, Jr., should have been granted. Moreno claims that he was detained without reasonable suspicion, that his subsequent arrest was without probable cause, and that his statements to law enforcement officers and consents to the search of his apartment and car were not given voluntarily. Libreros contends that he was detained without probable cause or reasonable suspicion, and that cocaine seized from him was not in plain view and was thus illegally seized. Libreros also contends that he was prejudiced by the court's refusal to let him display the bag that held the cocaine seized from him, together with the package of cocaine, either to the court at the suppression hearing, or to the jury at trial.

We affirm the judgments of conviction.

### Background

The factual summary that follows is based upon the testimony of two special agents of the Drug Enforcement Adminis-tration ("DEA"), Kevin F. Mancini and Marvin Siegel, at the suppression hearing which first considered the issues presented on this appeal. Mancini and Siegel were also the only government witnesses at trial, and the parties are in agreement that the agents' trial testimony concerning these issues substantially duplicated their testimony at the suppression hearing. That hearing resulted in an opinion by Chief Judge Platt which included factual findings consistent with the recital that follows. Defendants presented no testimony at either the suppression hearing or the trial.

On May 28, 1987, Mancini and Siegel went to an apartment building at 99–03 Corona Avenue, Queens, New York in order to locate and interview the wife of a fugitive sought by the DEA. As they approached the apartment, the agents saw Moreno and Libreros walking out of the building together, engaged in conversation. Libreros was carrying a white plastic bag. Neither Moreno nor Libreros was known to the agents.

Mancini decided to inquire if they had seen the fugitive, knew his wife, or knew in which apartment she lived. Mancini asked the defendants to "come over here for a second." The defendants responded by starting to proceed in the agents' direction, but Libreros stopped and only Moreno continued walking toward the agents.

Mancini then directed his attention to Moreno, while Siegel called out to Libreros and displayed his DEA shield, asking Libreros to speak with him. Libreros stopped, and Siegel observed him to be "visibly shaken"—fidgeting and moving the white plastic bag from hand to hand while his eyes darted about. Stating that he was with the police or DEA, Siegel asked Libreros, "What do you have in the bag?" Libreros replied, "comida" (the Spanish word for food), and opened the bag to show its contents to the agent. Siegel looked in the bag and observed a brick-shaped package wrapped in brown paper and tape which Siegel believed, based upon his experience, to contain cocaine. Siegel took the bag and walked Libreros back to the apartment building.

While this encounter was taking place, Mancini was speaking with Moreno in the vestibule of the building. In response to questions by Mancini, Moreno stated that he did not live in the building and did not know anyone who did. Moreno said that he was at the building to collect his mail, showed Mancini a key to the mailbox for apartment 3B, and opened the mailbox. Moreno was visibly nervous, and began to shake after opening the mailbox. His agitation increased when a beeper on his waistband sounded. When Siegel and Libreros arrived at the vestibule, Moreno began to shake so uncontrollably that Mancini thought Moreno would pass out. Siegel showed the package which he had seized to Mancini, who said "cocaina." At that juncture, Moreno "jump[ed] up," pointed at Libreros and said "he no with me. He no with me," whereupon Libreros immediately fled. Siegel pursued Libreros and, after being injured when Libreros closed a gate in his path, apprehended him two blocks away.

While Siegel pursued Libreros, Mancini turned Moreno around, put his chest against the wall of the vestibule and told him: "[S]tand there and don't move." At this juncture, Moreno volunteered that he did in fact live in the building, in apartment 3B, but continued to deny that he knew Libreros. After Siegel apprehended Libreros, both defendants were placed in handcuffs. Mancini asked Moreno if there were any more packages, or persons, in his apartment, and Moreno replied in the negative. Mancini then asked Moreno if he would allow a search of his apartment, and Moreno consented. Minutes later, after members of a New York City Police Department backup unit had arrived, Siegel asked Moreno if he objected to a search of the apartment. Moreno replied, "no," moving his hip in a manner indicating that the agents should take the keys from his pocket.

The search of the apartment, which was unoccupied at the time, yielded a plastic box bearing the word "Raina," a brand name for cocaine, and approximately $400 in cash. Mancini thereafter noticed a car key on Moreno's keychain, and asked Moreno if he owned a car. Moreno replied that he did, and that the car was parked nearby. In response to further inquiry, Moreno said that he had no objection to a search of the vehicle. In the ensuing search, Siegel recovered a jacket, which Libreros said was his. A pocket in the jacket contained immigration documents in the name of "Carlos Olivero Blanco," later identified as Libreros.

While Siegel searched Moreno's car, Mancini attempted to advise Moreno of his constitutional rights. Moreno, however, claimed that he could not understand Mancini, even though Moreno had up to that point appeared to have no difficulty comprehending or responding to the agents. Shortly after the vehicle search, the defendants were taken to the Metropolitan Correctional Center for processing. En route to the Center, Moreno's beeper sounded again, and the agents took it from him. At the Center, when the agents were obtaining information from Libreros, Moreno voluntarily spelled out Libreros' name when the agents had difficulty with it.

At the conclusion of the suppression hearing, the district court found that the detention of Moreno by Mancini while Siegel pursued the fleeing Libreros was not a formal arrest and was justified by "reasonable suspicion," thus being lawful under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court further found that even assuming Moreno was under arrest from the time of that initial detention, the arrest was supported by probable cause.

As to Moreno's alternative ground for suppression of his statements and of physical evidence—*i.e.*, that his statements to the agents were involuntary, thus negating consent to search his apartment—the court determined that the "totality of the circumstances here do not indicate that the constitutional threshold was exceeded," and generally credited Mancini's testimony indicating Moreno's consent to that search. As to the search of Moreno's car, the court concluded that no evidence implicating Moreno resulted therefrom, and that Libreros had no standing to challenge that search.

The district court also found that Siegel's initial encounter with Libreros was not a *Terry* stop "implicating the Fourth Amendment," since Libreros had been free to leave until the cocaine was discovered, and had not clearly indicated that he did not wish to speak to Siegel.

Based on these findings, the court entered an order denying defendants' suppression motions. Defendants were thereupon tried and convicted of the offenses charged, and this appeal followed.

### Discussion

We address: (1) the lawfulness of the agents' initial stop of defendants; (2) the existence of probable cause for the arrest of Moreno; (3) the applicability of the "plain view" doctrine to the warrantless seizure of cocaine from Libreros; (4) the voluntariness of Moreno's statements and consents to search his apartment and car; and (5) Libreros' claim that he should have been allowed to display the seized package of cocaine, and the bag which contained it, to the court at the suppression hearing and the jury at trial.

### A. *The Initial Stop of Defendants.*

■ The fourth amendment's prohibition of "unreasonable searches and seizures" does not control every encounter between citizens and police. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980); *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1984). When, however, an officer "even briefly detains an individual and restrains that person's right to walk away," he has effected a seizure and the limitations of the fourth amendment become applicable. *Sugrim*, 732 F.2d at 28; *see also Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *United States v. Adegbite*, 846 F.2d 834, 837 (2d Cir.1988).

The test for determining whether an encounter between a police officer and an individual constitutes a seizure is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Examples of circumstances that may indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.; see also Sugrim*, 732 F.2d at 28. On the other hand, "police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

In support of his claim, Libreros, who has limited proficiency in the English language, urges that Siegel's request to speak with him, coupled with Siegel's display of his badge and following closely upon Mancini's request to speak with the defendants, conveyed an "implication of obligation," *see United States v. Ceballos*, 812 F.2d 42, 48 (2d Cir.1987) (citing *Dunaway v. New York*, 442 U.S. 200, 207 n. 6, 99 S.Ct. 2248, 2253–54 n. 6, 60 L.Ed.2d 824 (1979), and quoting Model Code of Pre–Arraignment Procedure § 110.1 commentary at 261 (1975)), which led Libreros reasonably to believe that he was not free to leave. Thus, it is argued, the encounter was a seizure. Although Moreno's primary fourth amendment contention relates to his arrest at a later stage of his encounter with the DEA agents, he also contends that he was improperly seized as a result of his initial "stop" and questioning by Mancini in the vestibule of the apartment building.

We disagree. The initial contacts between the agents and both defendants were thoroughly consensual. Mancini merely asked defendants to "come over here for a second." Neither agent raised his voice, drew a weapon, touched the defendants, or physically impeded them in any way. Moreno responded to the request by voluntarily turning around and walking in the direction

of the agents. We see no serious argument that Moreno was seized at that juncture or during the ensuing events prior to his arrest in the vestibule of the apartment building, and Moreno makes only passing reference to this contention on appeal.

As to Libreros, although he initially took several steps away from the agents, he too stopped when Siegel identified himself as a police officer and asked to speak to him. Siegel asked Libreros what was contained in the bag he was shifting from hand to hand, and Libreros thereupon displayed its contents to him. At no point did Libreros indicate that he did not wish to speak with Siegel, nor did Siegel indicate either physically or verbally that Libreros could not walk away. Even considered in context, Siegel's displaying his badge and walking toward Libreros did not amount to the kind of imposing or intimidating presence that would transform their encounter into a seizure implicating the fourth amendment.

*United States v. Ceballos,* 812 F.2d 42 (2d Cir.1987), upon which Libreros relies, is not to the contrary. In that case, agents of the Secret Service came to Efrain Adames' place of work and asked Adames, who like Libreros was not proficient in the English language, to come to a field office for questioning. The request was made "at Adames' place of work and in a manner that the principal agent admit[ted] conveyed a strong sense of urgency and the impression that the agents did not intend to leave without Adames." 812 F.2d at 48. The "initial impression of obligation to accompany the agents was compounded by their denial of Adames' request to follow them in the company van." *Id.* We accordingly ruled that Adames had been seized, and suppressed evidence and statements subsequently elicited from him. As the foregoing quotations should make clear, however, there is little factual similarity between the situation presented in *Ceballos* and the chance street encounter between Siegel and Libreros upon which we must rule.

B. *The Detention of Moreno.*

█ We next consider Mancini's detention of Moreno while Libreros fled. Al-

though the district court found this to be merely a *Terry* stop requiring only reasonable suspicion on the part of the detaining officer, *see Adegbite,* 846 F.2d at 837 n. 4, we agree with Mancini's view that when he pushed Moreno against the wall and told him not to move, he was performing an arrest. *See Moran v. United States,* 404 F.2d 663, 666 (10th Cir.1968). Indeed, the government has conceded this in its brief on appeal. Accordingly, probable cause was required. *See Adegbite,* 846 F.2d at 837.

Probable cause exists for an arrest "if the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, would lead that police officer to believe that a criminal offense has been or is being committed." *United States v. Green,* 670 F.2d 1148, 1152 (D.C.Cir.1981); *see also Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964).

█ Moreno contends that his arrest in connection with Libreros' carrying of the cocaine was based not on independent grounds relating specifically to Moreno, but rather upon an impermissible "automatic or casual transference" of probable cause or suspicion from Libreros to Moreno. *See United States v. Afanador,* 567 F.2d 1325, 1331 (5th Cir.1978). While *Afanador* involved an airport search rather than an arrest, it makes clear that "[t]hough a Siamese symbiosis need not be demonstrated, more than physical companionship and/or a working relationship is required" to establish probable cause with respect to a companion of a suspect. *Id.*

Applying that principle to this case, we conclude that Moreno's arrest was lawful. Moreno exhibited mounting nervousness while being questioned by Mancini, and grew even more uneasy when his beeper sounded. When Siegel returned to the vestibule with Libreros, Moreno began shaking violently. In addition, Moreno had made the odd claim that he neither lived in the building nor knew anyone living there, even though he displayed the mailbox key for apartment 3B and said he had come to

pick up his mail. Furthermore, Moreno excitedly declared that he was not with Libreros, who the Agents knew to a virtual certainty had been transporting cocaine, and who was seen with Moreno moments before.

Clearly, these facts demonstrate that the suspicion which attached to Moreno resulted from far more than a mere "physical companionship and/or a working relationship" with Libreros. Though the inference might not be inescapable, an independent evaluation of Moreno's behavior could certainly lead a prudent officer to believe that Moreno "had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. at 91, 85 S.Ct. at 225; *see also United States v. Green*, 670 F.2d at 1152. Accordingly, there was probable cause for his arrest.

C. *The Seizure of Contraband.*

■ Libreros contends that Siegel's warrantless seizure of cocaine from Libreros was not justified under the "plain view" doctrine, which posits that a warrantless seizure by police of a "suspicious object" that comes into plain view in the course of an otherwise legitimate search will be considered reasonable under the fourth amendment. *See Texas v. Brown*, 460 U.S. 730, 737–39, 103 S.Ct. 1535, 1540–41, 75 L.Ed.2d 502 (1983) (plurality opinion); *see also Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1151, 94 L.Ed.2d 347 (1987); *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564 (1971) (plurality opinion).

As we said recently:

To seize an item on the theory that it is located in plain view, three conditions must be met. First, the initial intrusion by the police officer must be lawful so that he can justify being in a position to make his discovery. *Coolidge*, 403 U.S. at 466, 91 S.Ct. at 2038. Second, the discovery must be inadvertent. *Id.* at 466, 91 S.Ct. at 2038. Third, the police must have had probable cause to believe

that the item seized was evidence of a crime. *See Arizona v. Hicks*, 480 U.S. at 326, 107 S.Ct. at 1153; *United States v. $10,000 in United States Currency*, 780 F.2d 213, 219–20 (2d Cir.1986).

*United States v. Barrios–Moriera*, 872 F.2d 12, 15–16 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989).

The first condition poses no difficulty, since it was perfectly proper and lawful for Siegel to be in the public area where Libreros was walking, and to engage Libreros in a consensual conversation. The second requirement, inadvertent discovery, was satisfied when Libreros responded to a question about the bag's contents by voluntarily opening it and displaying its contents to Siegel; the agent's natural response was to look at what Libreros was showing him. "This does not suggest any unlawful rummaging—indeed, [Siegel's] viewing was fortuitous—therefore [Siegel's] viewing was inadvertent." *Barrios–Moriera*, 872 F.2d at 16.[1]

■ The third criterion, which requires the agent to have probable cause to believe the package was cocaine, presents a somewhat closer question. In our review of the issue, we are guided by two general considerations. The first is the proposition that "probable cause is a flexible, common-sense standard" requiring only a " 'practical, non-technical' probability that incriminating evidence is involved," *Texas v. Brown*, 460 U.S. at 742, 103 S.Ct. at 1543 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). The second is our recognition that the "evidentiary significance of an item viewed must be assessed from the perspective of a law enforcement officer," and that the "matrix of facts and circumstances, including the experience and judgment of the police officer, must be weighed in determining whether [an] item is contraband." *Barrios–Moriera*, 872 F.2d at 17;

---

1. Justice White has expressed the view that "the so-called 'inadvertent discovery' prong of the plain-view exception to the Warrant Clause ... has never been accepted by a judgment supported by a majority of this Court...." *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987) (White, J., concurring); *see also Texas v. Brown*, 460 U.S. 730, 744, 103 S.Ct. 1535, 1544, 75 L.Ed.2d 502 (1983) (White, J., concurring).

*see also Texas v. Brown,* 460 U.S. at 742, 103 S.Ct. at 1543.

Applying these principles to the instant case, we note that Siegel is a DEA agent with sixteen years of experience investigating narcotics offenses. He recognized the seized item from its shape, size, color and packaging to be, most likely, a brick of cocaine. Moreover, he made that determination in the context of Libreros' extremely nervous behavior and evidently false statement that the bag contained food. Under these circumstances, Siegel had sufficient grounds to ascertain a " 'practical, non-technical' probability" that the package shown to him by Libreros contained cocaine. *Texas v. Brown,* 460 U.S. at 742, 103 S.Ct. at 1543 (quoting *Brinegar v. United States,* 338 U.S. at 176, 69 S.Ct. at 1311).

### D. *The Voluntariness of Moreno's Statements and Consents.*

▮ Moreno further contends that his statements were elicited involuntarily, rendering them inadmissible and negating his spoken consent to the search of his apartment and vehicle. He argues that he had "no choice but to acquiesce to the apparent authority of the agent" to ask questions and to conduct a search because he was in custody, had difficulty speaking English, was without the assistance of counsel, and was not apprised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

▮ A person placed in official custody is not thereby rendered incapable of giving his free and voluntary consent to a warrantless search. *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976); *United States v. Marin,* 669 F.2d 73, 82 (2d Cir.1982). The voluntariness of a consent depends on the totality of the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *Marin,* 669 F.2d at 82–83, and is a question of fact to be determined by the district court. *Marin,* 669 F.2d at 83.

After receiving testimony in the suppression hearing, the district court found Mancini's testimony as to Moreno's consent to the search to be credible. The court stated:

> Moreno was apprehended and consented to the search while in a public area, not in an interrogation room or a stationhouse. He was not physically abused or verbally threatened. Weapons were not displayed. Moreno's twice-expressed consent came after only a very brief period of detention, not after a prolonged period of confinement intended to overcome his will. Although the hearing testimony raised an issue as to Moreno's ability to express himself fully in English, this Court finds that he understood Special Agent Mancini's request and assented to it.

▮ We find nothing in the record before us indicating that the district court's findings were clearly erroneous, and we therefore must leave them undisturbed. *See United States v. Rosario,* 638 F.2d 460, 462 (2d Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 202 (1981). The fact that Moreno was not informed of his *Miranda* rights prior to the search does not affect our conclusion, since *Miranda* does not "require[ ] the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent." *Schneckloth v. Bustamonte,* 412 U.S. at 246, 93 S.Ct. at 2058; *cf. Campaneria v. Reid,* 891 F.2d 1014, 1019–20, (2d Cir.1989) (failure to give *Miranda* warnings a relevant factor in overall determination of voluntariness). This is true even when such consent was given while the defendant was in custody. *Watson,* 423 U.S. at 424–25, 96 S.Ct. at 828–29.

### E. *Display of Bag and Cocaine.*

▮ Libreros urges, finally, that he was "unable to effectively present his defense" when the district court, at both the suppression hearing and the trial, denied his requests to make a physical demonstration with the brick of cocaine and the bag from which it was seized to show the "common place [sic] nature of the package and the opaqueness and contour of the bag." Especially since the defense was accorded considerable leeway to explore the charac-

teristics of the cocaine and bag on cross-examination, Libreros fails to demonstrate that these rulings constituted an abuse of discretion, or, in any event, that he was prejudiced by them.

### Conclusion

The judgments of conviction are affirmed.

PIERCE, Circuit Judge, dissenting in part:

I agree with the majority that the conviction of appellant Moreno should be affirmed. However, as far as the affirmance of appellant Libreros's conviction is concerned, "I dissent from the conclusion that the confluence of earlier events and the substantial experience of the federal agent warranted [the agent's] 'plain view' seizure of the [brick-shaped] package in appellant's open ... bag." *United States v. Barrios–Moriera*, 872 F.2d 12, 18 (1989) (Pierce, J., dissenting).

Initially, I note that in both *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion), and *Barrios–Moriera*, upon which today's majority relies, there existed a particularized basis for suspecting that the defendant was involved with drugs and that his possession of a particular item was not innocent. In *Brown*, "the police officer ... saw [, in addition to the uninflated, tied-off balloon eventually seized by him,] '*several small plastic vials [and] quantities of loose white powder.*'" *Barrios–Moriera*, 872 F.2d at 18 (Pierce, J., dissenting) (quoting *Brown*, 460 U.S. at 734, 103 S.Ct. at 1539) (emphasis added in *Barrios–Moriera*). Similarly, in *Barrios–Moriera*, the majority emphasized that the defendant had evinced a prior "interest in [an] Audi automobile [law enforcement officers] were surveilling in connection with a *drug* -related homicide." *Id.* (emphasis in original). Here, however, there is an absence of any circumstance—other than the viewing of the package itself—that specifically links the defendant with drugs.

I do not suggest a particularized basis should always be required. In my view,

however, the absence of such a basis requires a greater confluence of general factors than are present here. In this regard, I note that although the majority asserts that Libreros's statement that the bag contained food was "evidently false," I am unaware of any finding made by the district court concerning this point. The finding of probable cause is further undercut by the fact that Libreros stopped when he was asked, and voluntarily opened his bag. If we are to view, as we have, a failure to stop when requested by a law enforcement official as supporting "a rising tide of suspicion" of drug involvement, *id.*, we might view Libreros's cooperation as supporting the contrary inference.

In sum, this case brings us uncomfortably close to holding that the mere viewing of a package of the type present here, by itself, constitutes probable cause. *See id.* at 17 (rejecting suggestion that "the mere viewing and evaluation of the package alone constituted probable cause."). I feel constrained to reverse as to Libreros.