UNITED STATES of America, Plaintiff,

v.

**Dharamdeo BABWAH and Deodath Maharaj, Defendants.**

**Crim. No. 91–CR–701 (S–1).**

United States District Court, E.D. New York.

Sept. 12, 1991.

Andrew Maloney and Ilene B. Weininger, Asst. U.S. Attys., Brooklyn, N.Y., for U.S.

Henry Gargano, Brooklyn, N.Y., for Babwah.

Robert Manoman, Richmond Hills, N.Y., for Maharaj.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

GERALD E. ROSEN, District Judge.*

### I. INTRODUCTION

Defendants Dharamdeo Babwah and Deodath Maharaj are charged with money laundering and violation of the federal currency reporting statutes. The charges against Defendants arise out of a United States Customs Service investigation, surveillance and subsequent search of residential premises located at 103–16 107th Street in Ozone Park, Queens on June 13, 1991.

Presently before the Court are Defendants Babwah's and Maharaj's separately-filed Motions to Suppress Evidence of the currency, bank deposit slips, and other financial records found at the 107th Street premises, as well as statements made by the Defendants to Customs agents during and after the search of the premises.

The Court heard the testimony of the three Customs agents involved in the June 13, 1991 surveillance and search—Special Agents Robert Devine, Brian Aryai, and Steven Garsh—and also received into evidence documentary evidence regarding this matter on August 26 and 27, 1991, including the Affidavit of U.S. Customs Special Agent James E. McAndrew, which was originally submitted in support of a seizure warrant to seize the contents of a bank account.

### II. FINDINGS OF FACT

Based on the testimony and other evidence received by the Court during the two days of proceedings on this matter, the Court makes the following findings of fact.

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

On June 13, 1991 Special Agents Robert Devine and Brian Aryai of the U.S. Customs Service were engaged in a surveillance of a residence located at 103–16 107th Street in Ozone Park, Queens (referred to herein as the "premises" or the "residence") in connection with an ongoing Customs Service money laundering/currency reporting violation investigation which was precipitated by the seizure of a large amount of currency a week earlier from a bank account of Juan Carlos and Sara Ve Agreda.

Both Agent Aryai and Agent Devine are experienced Customs investigators. Agent Aryai testified that he has been a Customs Special Agent for 8 years. Agent Devine, who has been a Customs Service Special Agent for 4 1/2 years, testified that he has been involved in approximately 100 money-laundering and narcotics investigations.[1]

During their surveillance of the 107th Street premises on the morning of June 13, 1991, Agents Devine and Aryai, stationed in separate cars, observed Defendants Babwah and Maharaj exit the residence with a female, who was subsequently identified as Mrs. Agreda. The three got into a red BMW and Defendant Babwah proceeded to drive away, with Defendant Maharaj in the front passenger seat and Mrs. Agreda in the back seat. Agents Devine and Aryai followed them.

The two agents, (one of whom stayed at virtually all times directly behind the red BMW), observed the Defendants drive in an evasive manner—they kept zigzagging and squaring-the-blocks every block rather than proceeding on a direct route to their ultimate destination on Liberty Avenue. They further observed the Defendants continuously look into the rear view mirrors as if to see whether they were being followed, and appear to make several telephone calls on a cellular telephone in the car.

At the corner of 121st Street and Liberty Avenue, all three occupants of the BMW got out of the car and entered Lefferts Realty. A short time later, Defendant Maharaj returned to the car and retrieved a large brown paper bag, and went into the Citibank directly across the street from Lefferts. Agent Devine followed him into the bank.

Devine observed Maharaj proceed to the back of the bank and meet with a bank employee. The two of them then went to a teller's window and Devine overheard the teller discussing the currency transaction reports ("CTR's") that banks are required to submit to the Government for deposits in excess of $10,000. Devine observed Defendant Babwah come into the bank two minutes later, speak briefly with Maharaj then leave. Defendant Maharaj subsequently left the bank as well, leaving the brown paper bag with which he had entered with the bank employee. He proceeded, as had Babwah, to return to Lefferts Realty office across the street. A few minutes later, the Defendants and Mrs. Agreda returned to the BMW and drove away.

Agents Devine and Aryai continued to follow them but their evasive driving tactics proved successful—the agents had managed to maintain their surveillance for a while despite the Defendants' having run a red light, but when the Defendants ran a second red light, the agents were cut off by a truck crossing the intersection. As a result, they lost sight of the BMW.

Having lost sight of the car, the agents returned to resume surveillance of the 107th Street residence. Later that day, again while stationed in their separate cars near the residence, Devine and Aryai observed Defendant Maharaj park a different car around the corner from the 107th Street residence, proceed to enter the premises and then leave a few minutes later with a large suitcase. Upon exiting, Maharaj walked toward Liberty Avenue and met up with Defendant Babwah and Mrs. Agreda who were waiting in the red BMW.

Agents Devine and Aryai followed them. Once again, the Defendants took an evasive, zigzagging route to their ultimate destination—a house near 116th Street and

---

1. Agent Steven Garsh, who was the "case agent" in charge this particular investigation, testified that he has been a Special Agent with the Customs Service for 14 years.

Atlantic Avenue. All three occupants of the BMW got out of the car there, entered the house, and then exited with more suitcases which they put in the car then drove away.[2] The agents continued to follow them.

When the Defendants resumed their circuitous driving tactics, Devine and Aryai put their flashers on, Agent Aryai put his siren on, and they pulled the BMW over. When the BMW slowed down to pull over, Agent Devine pulled his car diagonally in front of the BMW, and Aryai pulled in behind it. Both agents testified that Defendants could not have driven away without hitting the agents' cars.

Agent Aryai testified that Defendant Babwah, who was driving the BMW, "bolted" out of the car after he and Agent Devine had pulled them over and asked, "What's the problem?" Aryai shouted to him with his megaphone to get back into the car. Babwah complied and got back into the BMW. Both Agent Devine and Agent Aryai then exited their cars simultaneously and approached the BMW. They identified themselves as Customs agents to the occupants of the car and told them that they were investigating money laundering. At the time, the agents were not wearing any kind of uniform and did not display their weapons. Agent Aryai then told Defendant Babwah to get out of the car, and to put his hands up. When he did, Aryai patted him down. Defendant Maharaj and Mrs. Agreda remained inside the car. Agent Devine told Defendant Maharaj and Mrs. Agreda to keep their hands where he could see them.

After patting down Defendant Babwah, Agent Aryai asked him for his registration for the BMW. Babwah said that the BMW was not his, that it belonged to a friend, and he produced copies of registration and insurance certificates which showed the registered address as the 107th Street residence. The agents then asked Babwah whether they could search the car and luggage. Babwah consented to the search but said that the luggage belonged to Mrs.

Agreda. Mrs. Agreda confirmed that the suitcases belonged to her. She said she was on her way to the airport, but she had no objections to a search of her luggage. Neither of the agents asked Defendant Maharaj for his consent to a search of the car or luggage.

Accompanied by Defendant Babwah to the rear of the car, the agents opened the trunk and searched the trunk and suitcases. No narcotics or currency, or any evidence of a crime were found; all that was in the suitcases was clothing, personal items, and some candy bars.

Thereafter, Agent Aryai asked Babwah, "Have you ever been to this address [the 107th Street address on the car registration]?" He said "No." The agents then asked whether the occupants of the car would come to the 107th Street premises with them. They agreed. They asked Mrs. Agreda to ride with Agent Aryai, and asked Babwah's consent to Agent Devine riding in the BMW with Babwah and Maharaj. Babwah consented to the arrangement and Agent Devine got in the back seat of the BMW, while Defendant Maharaj stayed in the front passenger seat while Defendant Babwah drove. Devine testified that he did not ask the Defendants anything during the ride to 107th Street, nor did he give Defendants any directions to get to the 107th Street residence.

Once the group arrived in front of the 107th Street premises, both Defendants Babwah and Maharaj denied ever having been at the house, and further denied ever having been on that block. Agent Aryai then confronted them with having previously seen them at that residence, and the Defendants then changed their story. First they said they had been there a few times but still denied living there. Defendant Babwah subsequently said that the residence was his friend Juan Carlos Agreda's house, but he was staying there for a while. Then he again changed his story and said, "I lied. I live here," and produced the key to the front door.

---

**2.** Agent Devine testified that, based on his experience as a Customs Agent, money launderers and drug traffickers frequently transport large amounts of currency in suitcases.

Agent Aryai testified that he then said to Defendant Babwah, "Since you live here, can we go upstairs and search?" Aryai said that Babwah verbally consented. Agent Aryai then hand-wrote a consent form on a blank piece of paper and Defendant Babwah signed that handwritten form.[3] Aryai testified that he usually carries extra blank consent forms but he did not have any with him on June 13th. Neither of the agents asked Defendant Maharaj for his consent to search the premises.

The two agents then went into the residence and did a security sweep. After they had done so, Agent Aryai told Babwah, "We're looking for guns, cash and narcotics," and Babwah responded that there were none.

Agent Devine sat in the kitchen with Defendant Maharaj and Mrs. Agreda, while Defendant Babwah went with Agent Aryai, who conducted the actual search.

Aryai found a large brown paper bag in the bedroom closet which contained $7,098 in singles. Babwah first told Agent Aryai that that money was not his. Then, 10 minutes later he said he had lied and that the money was his and that as far as he knew, there was no more cash in the house. Aryai continued his search of the closet. As he approached a duffel bag, Babwah grabbed the bag and said there was more money in it. The duffel bag in fact contained $168,700 in cash.

Babwah originally said that the money was his profits from his fruit and vegetable stand. When Agent Aryai asked him what all that cash was doing in his house and why he didn't put the money in the bank, Babwah changed his story—he told Agent Aryai that he had brought most of the money in from Trinidad all in one trip. He also told Aryai that he knew the federal currency reporting requirements regarding bringing money into the United States. Aryai then placed Defendant Babwah under arrest and read him his *Miranda*

rights. Agent Aryai testified that while reading Defendant Babwah his rights, Babwah verbally said "yes" when asked if he understood them and he also said "yes" when asked if he was agreeing to waive his rights.

Case Agent Steven Garsh subsequently arrived at the premises and after being apprised of the situation—but being unaware that Agent Aryai had already placed Defendant Babwah under arrest—Garsh also informed Babwah that he was under arrest, and Garsh then also read Babwah his rights. As with Agent Aryai, Garsh testified that when he read Babwah his *Miranda* rights, Babwah said that he understood them and wanted to continue talking.

Meanwhile, Agent Devine had been sitting at the kitchen table with Defendant Maharaj and Mrs. Agreda. After they had engaged in some small talk, Defendant Maharaj told Agent Devine that he once had brought $30,000 in cash from Trinidad on one occasion. He explained how he and two friends carried just under $10,000 each into the country to avoid having to report it. Agent Devine immediately placed Defendant Maharaj under arrest and read him his rights. Agent Devine testified that when he read Defendant Maharaj his rights, Maharaj said that he understood them and would continue to answer Devine's questions.

Maharaj then showed Agent Devine one bank deposit slip (Devine found two more deposit slips after reading Maharaj his rights in a little black case where Maharaj kept his passport). The deposit slip had the 107th Street residence address on it. When Agent Devine asked Maharaj why he used the 107th Street residence as his address on the bank slips, Maharaj admitted for the first time that he lived there.

The foregoing factual narrative is based upon the testimony of the three Customs agents—Agents Devine, Aryai and Garsh—and the documentary evidence submitted

---

**3.** Agent Aryai testified that he had drawn a signature line well below the handwritten consent language, but that Babwah insisted on signing directly under the language because he said

he was afraid the agent would add something more above his signature after he signed if he signed on the line drawn by Aryai.

by the Government. Defendants did not put on any testimony or other evidence to contradict the agents' version of the events, and the Court finds the agents' unrebutted testimony to be largely credible.[4]

Both Defendant Maharaj and Defendant Babwah now move to suppress the evidence of the currency and the deposit slips retrieved from the 107th Street premises and further move to suppress any statements made by them during and after the search.

The gist of Defendants' argument is that they were illegally seized and detained by Agents Devine and Aryai as of the moment that they were pulled over by the agents in the car. Defendant Babwah contends that his illegal seizure taints his consent to the search of the 107th Street premises and, thus, they argue that the evidence found by the agents during the June 13, 1991 search of the premises must be suppressed. He further argues that because he was illegally detained, the statements he made to the agents on June 13th regarding the source of the currency and the importation of it from Trinidad must be deemed to be involuntary.

Defendant Maharaj argues that because he never consented to accompanying the agents back to the 107th Street premises and never consented to the search of the premises, the coercive nature of the events of June 13 renders any statements made by him to Agent Devine regarding his money importing activities must be deemed involuntary and, thus, the statements and the physical evidence found by or given to the agents while in the residence that day must be suppressed as violative of the Fourth and Fifth Amendments.

The Government's position is that the Defendants were not seized prior to being placed under arrest at the 107th Street residence. According to the Government, prior to the point in time when the Defendants were placed under arrest, they were free to leave and go their own way.

## III. LEGAL DISCUSSION

### A. A FOURTH AMENDMENT "SEIZURE" OCCURRED WHEN THE AGENTS PULLED DEFENDANTS OVER IN THE BMW.

The threshold issue in this case is whether Agents Devine's and Aryai's initial contact with the Defendants when they pulled them over in the BMW constituted a "seizure" within the meaning of the Fourth Amendment. Only if the Defendants were "seized", are they vested with any right to constitutional safeguards. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980); *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990); *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir.1984); *United States v. Galindo–Hernandez*, 674 F.Supp. 979, 982 (E.D.N.Y.1987).

In *United States v. Mendenhall, supra,* the Supreme Court stated, "We adhere to the view that a person is 'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained." 446 U.S. at 553, 100 S.Ct. at 1876. The Court went on to delineate examples of circumstances that might indicate a seizure and held that a person has been "seized" within the meaning of the Fourth Amendment when

in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure even where the person did not attempt to leave, would be the threatening presence

---

4. The only evidence offered by Defendants at the August 26–27 proceedings was the NYNEX telephone bill showing that no telephone calls were made from a certain cellular phone number which purportedly is the cellular phone in the red BMW. With respect to this phone bill, as the Government's counsel pointed out at the August 27 hearing, Defendants presented no foundation/authentication evidence for this document. Nor was any evidence presented to establish that the bill is for the particular cellular phone at issue. Even if it were, the Court notes that while the NYNEX bill indicates that no *outgoing* calls were made on the cellular phone, this evidence does not establish that the Defendants did not take any *incoming* calls on June 13, 1991 when the agents observed them in the BMW using the phone.

of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

446 U.S. at 554–555, 100 S.Ct. at 1877. [Citations omitted.][5] *See also, Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person.")

As the Second Circuit explained in *United States v. Madison,*

> While [an officer's] restraint [of the freedom of a person] does not have to be physical, it nonetheless must result in a restriction of the individual's autonomy; in general, the cases turns on the degree of voluntariness that an individual maintains in an encounter with police.

936 F.2d 90 at 93. (2nd Cir.1991).

■ By application of the foregoing authorities to the facts of this case, the Court finds that a "seizure" and custodial detention of the Defendants occurred at the point when Agents Devine and Aryai pulled them over in the BMW with their flashers on and Agent Aryai's siren sounding, and pulled their cars immediately in front of and behind the BMW. Although the Government strenuously argued at the hearing on this matter that Defendants were at all times free to leave, the Court finds that when a reasonable person is signaled to pull his car over by police flashers and sirens, and is "penned in" by the placement of the officers' cars, he would not feel "at liberty to ignore police presence and go about his business", *Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). *See also, United States v. Moreno,* 897 F.2d 26, 30 (2d Cir.1990), *cert. denied,* —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990) ("When ... an officer even briefly detains an individual and restrains that person's right to walk away, he has effected a sei-

zure and the limitations of the fourth amendment become applicable." *Id.*); *United States v. Jones,* 846 F.2d 358, 361 (6th Cir.1988) ("[D]efendant was in custody when three police officers, in three separate police cars, lights flashing, surrounded Jones's car, blocking him from leaving the scene. At this point the police had deprived Jones of his 'freedom of action' in a 'significant way,' and placed him in a custodial situation." *Id.*)

Moreover, the flashers, siren, and placement of the agents cars in front of and behind the BMW were not the only show of authority displayed by Agents Devine and Aryai or the only indications of a restraint of Defendants' liberty. Agent Aryai testified that he used his megaphone to order Defendant Babwah back into the car when he "bolted" out of the car and asked "What's wrong?" immediately after being pulled over. Also, Agent Devine testified that while Agent Aryai was later talking to Defendant Babwah outside of the car, he told Defendant Maharaj and Mrs. Agreda to "keep their hands where he could see them."

Furthermore, although it is undisputed that Defendant Babwah consented to driving to the 107th Street residence and consented to Agent Devine riding in the backseat of the BMW en route to the premises, with Mrs. Agreda riding in Agent Aryai's car, the Court is hard-pressed to accept the Government's contention that "they were at all times free to go as they pleased"; it strains credulity to believe that, with an armed officer riding in the backseat of the car, a reasonable person would feel free to drive off to wherever he desired.

In sum, the Court concludes that the totality of the actions of Agents Devine and Aryai demonstrated a sufficient show of official authority such that a reasonable person would not have felt free to leave and go about his or her business. Thus, the Court finds that Defendants were

---

**5.** The Supreme Court recently reaffirmed its adherence to the *Mendenhall* test in *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), and in that case, made clear that what is meant by a "reasonable person"

under *Mendenhall* is a "reasonable *innocent* person". Specifically, the Court stated, "[T]he potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position." *Id.*

"seized" and from the moment of their initial encounter with the agents when they pulled the BMW over, Defendants were "in custody".

## B. THE AGENTS HAD PROBABLE CAUSE TO ARREST AND DETAIN DEFENDANTS.

■ The question thus becomes, did the agents have probable cause to detain and arrest the Defendants? Probable cause exists to arrest and place a person in custody "if the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, would lead that police officer to believe that a criminal offense has been, or is being, committed." *United States v. Moreno*, 897 F.2d 26, 31 (2d Cir.1990), *cert. denied*, —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990). *See also, Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–226, 13 L.Ed.2d 142 (1964).

■ In this case, two experienced Customs agents were involved in an ongoing money-laundering investigation,[6] and in connection with that investigation, had the 107th Street residence under surveillance. As set forth above, prior to pulling Defendants over, they observed them zigzagging and squaring-the-blocks every block rather than proceeding on a direct route to their ultimate destinations on Liberty Avenue and 116th Street. They further observed them running red lights and continuously looking into the rear view mirrors as if to see whether they were being followed, and appeared to make several telephone calls on a cellular telephone in the car.

They observed the Defendants and Mrs. Agreda go into a realty office and Defendant Maharaj exit a short time later to retrieve a large brown paper bag from the BMW the Defendants had been driving and take that bag into the Citibank across the street. Devine observed Maharaj proceed to a teller's window and overheard the teller discussing the currency transaction reports ("CTR's") that banks are required to submit to the Government for deposits in excess of $10,000. Devine observed Defendant Babwah come into the bank two minutes later, speak briefly with Maharaj then leave. Defendant Maharaj subsequently left the bank as well, *leaving the brown*

---

**6.** Government Exhibit 3500–1, the Affidavit of U.S. Customs Special Agent James E. McAndrew, provides information regarding the money-laundering investigation. According to Agent McAndrew's Affidavit, that investigation began the first week of June 1991 after the Customs Service was notified by bank personnel at a small New York City branch of the Venezuelan bank, Banco Consolidado, of certain suspicious large cash transactions involving a joint bank account in the name of Juan Carlos and Sara Ve Agreda. There had been little activity involving that account from the time that it was opened in January 1991 through May 1991. However, on June 4, 1991, Agreda telephoned the bank claiming that he was in Tokyo on business, and asked whether a friend could make a deposit in his account during that week. After the bank told Agreda that that would not be a problem, the next day, June 5, 1991, a man identified as Mario Manuel Garrito arrived at the bank with a duffel bag containing $198,000 in cash, primarily $10 and $20 bills to deposit in Agreda's account. Garrito told bank personnel that Agreda had a toy business in Venezuela and that the cash was from wholesale sales of the toys to customers in Chinatown who pay in cash. He advised bank personnel that he would return shortly with three or four more similar cash deposits to make for Agreda.

The next day, Garrito returned to the bank with another duffel bag full of cash which he said totaled $230,000. Bank personnel told him that it would take some time to count the money. Garrito said he had an appointment but would return in 20 minutes. He left the bag with the cash in the bank. When he did not return in 20 minutes, the bank attempted to locate him and contact Agreda. A bank employee telephoned a number in Venezuela which Agreda previously provided to the bank as the number of his toy business there, however, the telephone number turned out to be Agreda's mother's number, not the number of his purported toy business.

Garrito eventually returned to the bank three hours later and was advised by bank personnel that they simply did not have enough manpower to process Agreda's cash transaction. They urged Garrito to have Agreda open a corporate account for his toy business and to provide invoices reflecting the source of the cash to be deposited if Agreda wanted to make further cash deposits at the bank. Garrito said he understood the bank's position and left with the cash. However, on June 7, 1991, Garrito telephoned an officer at the bank, invited him to dinner that night, and again asked if the bank could make arrangements to process another large cash deposit into the Agreda account. The officer declined the invitation.

*paper bag with a bank employee.*[7] Both Agents Aryai and Devine testified that money launderers frequently transport currency in large paper bags and suitcases.

They further observed the Defendants carry large suitcases out of the 107th Street and 116th Street residences and then drive off, again zigzagging and trying to avoid being followed.

█ Based on the foregoing facts, the Court finds that the Agents had probable cause to pull Defendants over and place them in custody. Defendants argue that whatever probable cause the agents may have had prior to pulling them over, once they searched the car and found no evidence of criminal activity, they no longer had cause to continue to detain them to proceed to the 107th Street residence.

First, Defendants' argument ignores the fact that probable cause is based upon *the totality of the circumstances.* Here, when the agents questioned Defendant Babwah when they pulled the BMW over, Babwah gave contradictory explanations regarding the ownership of the car, the address on the registration, and how he happened to be driving it. These further questions, added to the agents' earlier observations and coupled with the agents' knowledge of the on-going Agreda investigation, gave them probable cause to continue the detention of the Defendants to continue the investigation with respect to the 107th Street residence.

Second, Defendants' argument further ignores the fact that Defendant Babwah, who was driving the BMW, *consented* to the continued investigation, and as discussed, *infra* in Section C of this Memorandum Opinion and Order, the fact that he was in custody does not negate that consent.

Since the agents had probable cause to arrest the Defendants, their seizure, arrest and detention did not violate the Fourth Amendment.

**C. THE SEIZURE, ARREST AND CUSTODIAL DETENTION OF THE DEFENDANTS DOES NOT VITIATE THE VOLUNTARINESS OF DEFENDANT BABWAH'S SUBSEQUENT STATEMENTS, INCLUDING HIS CONSENT TO SEARCH THE CAR, ACCOMPANY THE AGENTS TO THE 107TH STREET RESIDENCE, AND SEARCH THE RESIDENCE.**

█ Although the Court finds that Defendants were "seized" and in custody within the meaning of the Fourth Amendment from the point in time when Agents Devine and Aryai pulled them over in the BMW, the fact a person is placed in official custody does not render him incapable of giving his free and voluntary consent to a warrantless search. *United States v. Moreno, supra,* 897 F.2d at 33. In this case, both Agent Aryai and Agent Devine offered unrebutted testimony that Defendant Babwah consented to the search of the BMW and twice consented—once orally and once in writing—to the search of the 107th Street residence.

Defendant Babwah now contends that his consent was tainted by the coercive nature of the show of authority of the Agents and was thereby rendered involuntary. This was the same argument made by one of the defendants in *Moreno, supra,* which is a case that is strikingly similar in its facts to the instant action with respect to the consent issue.

In *Moreno,* two DEA agents, Agent Mancini and Agent Siegel, were assigned to locate and interview the wife of a fugitive defendant in another matter, when they observed the two *Moreno* defendants, Pedro Moreno and Carlos Libreros, exit the apartment building in Queens where the woman they were looking for lived. When the agents initially observed Libreros and Moreno exiting the building, the two defendants were engaged in conversation. Libreros was carrying a white plastic bag.

7. According to Agent McAndrew's Affidavit, this "drop off" technique had been used before in connection with deposits of large amounts of cash into Mr. and Mrs. Agreda's account at the Banco Consolidado, and, as explained in footnote 6, *supra,* those prior deposits of more than $100,000 in cash each was what precipitated the surveillance of the 107th Street residence.

Neither Libreros nor Moreno was known to either of the agents.

Agent Mancini decided to inquire if they had seen the fugitive defendant they were looking for, or knew his wife or which apartment she lived in. He asked the two defendants to "come over here for a second". Moreno proceeded toward the agents, but Libreros stopped in his tracks. Agent Siegel, thus, proceeded toward Libreros.

Siegel showed his badge to Libreros and asked him, "What do you have in the bag?" Libreros replied, "comida" (the Spanish word for food), and opened the bag to show its contents. In the bag was a brick-shaped package wrapped in brown paper and tape which Siegel believed based upon his experience to be cocaine. Siegel took the bag and walked Libreros back to the apartment building.

While the encounter between Agent Siegel and Libreros was taking place, Agent Mancini was speaking with Defendant Moreno in the vestibule of the apartment building. Moreno told Mancini that he did not live in the building and did not know anyone who did. He said he was only at the building to collect his mail and showed Mancini a key to a mailbox. Siegel then returned to the vestibule with Libreros. He showed the package he had seized to Agent Mancini and said "cocaina", at which point, Moreno jumped up, pointed at Libreros and said, "He no with me. He no with me." Whereupon Libreros fled. Agent Siegel pursued him.

While Agent Siegel was pursuing Libreros, Agent Mancini turned Moreno around, put his chest against the wall of the vestibule and told him, "Stand there and don't move." At that juncture, Moreno volunteered that he did in fact live in the building, but he still denied knowing Libreros. When Siegel apprehended Libreros and returned to the apartment building vestibule with him, both Moreno and Libreros were placed in handcuffs.

Mancini asked Moreno if there were any more packages or persons in his apartment.

Moreno said "no." Then Mancini asked Moreno if he would allow a search of his apartment, and Moreno consented. Minutes later, after a police back up unit arrived, Agent Siegel also asked Moreno if he objected to a search of his apartment. Moreno replied "no", and moved his hip in a manner to indicate that the agents should take the keys out of his pocket.

The search of the apartment yielded a plastic box with the word "Raina", a brand name for cocaine, and approximately $400 in cash. The agents then noticed a car key on Moreno's key chain and they asked him if he owned a car. He said that he did, and in response to further inquiry said he had no objection to a search of the car. The car search turned up a jacket which Defendant Libreros said was his and a pocket of the jacket had Libreros' immigration documents in it. It was during the car search that Agent Siegel first read Moreno his *Miranda* rights.

Both defendants moved to suppress the evidence of the drugs, the evidence found in Moreno's apartment and car, and the statements made by them, including Moreno's statements and consents to search. Their suppression motion was denied, and they were subsequently tried and convicted.

On appeal, Moreno argued that the trial court had erred in determining that Mancini's detention of him while Libreros fled was merely a *Terry* stop,[8] instead of a custodial detention tantamount to an arrest, and his statements, including his consent to the search of his apartment and car were elicited involuntarily. He argued that he had "no choice but to acquiesce to the apparent show of authority of the agent" to ask questions and to conduct a search because he was in custody. 897 F.2d at 33. Moreno further argued that the evidence should have been suppressed by the trial court because he was not informed of his *Miranda* rights before he consented to the searches.

The Second Circuit agreed with Moreno with respect to what the nature of his encounter with the DEA agents was at the

---

**8.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20  L.Ed.2d 889 (1968).

time that Agent Mancini pushed him up against the wall and told him not to move. The appellate court determined that Agent Mancini had, at that point, effectively performed an arrest. 897 F.2d at 31.

With respect the issue of the voluntariness of Moreno's statements and consents, however, the Second Circuit held that Moreno made the statements and consented to the searches voluntarily. The court explained:

> A person placed in official custody is not thereby rendered incapable of giving his free and voluntary consent to a warrantless search. *United States v. Watson,* 423 U.S. 411, 424–425, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976); *United States v. Marin,* 669 F.2d 73, 82 (2d Cir.1982). The voluntariness of a consent depends on the totality of the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *Marin,* 669 F.2d at 82–83, and is a question of fact to be determined by the district court. *Marin,* 669 F.2d at 83.

After receiving testimony in the suppression hearing, the district court found Mancini's testimony as to Moreno's consent to the search to be credible. The court stated:

> Moreno was apprehended and consented to the search while in a public area, not in an interrogation room or stationhouse. He was not physically abused or verbally threatened. Weapons were not displayed. Moreno's twice-expressed consent came after only a very brief period of detention, not after a prolonged period of confinement intended to overcome his will.

> We find nothing in the record before us indicating that the district court's findings were clearly erroneous, and we therefore must leave them undisturbed.

897 F.2d at 33.

The court then went on to address Moreno's alternative argument that his statements and consents had to be suppressed because before he made the statements and gave his consents, he was not read his *Miranda* rights:

> The fact that Moreno was not informed of his *Miranda* rights prior to the search does not affect our conclusion, since *Miranda* does not "require the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent." *Schneckloth v. Bustamonte,* 412 U.S. at 246, 93 S.Ct. at 2058.... This is true even when such consent was given while the defendant was in custody. *Watson,* 423 U.S. at 424–25, 96 S.Ct. at 828–29.

*Id. See also, United States v. Mendenhall, supra,* 446 U.S. at 558–559, 100 S.Ct. at 1879–1880 (knowledge of a right to refuse is not the *sine qua non* of an effective consent to a search).

Applying the foregoing authorities to the facts of this case, the Court finds that, notwithstanding the fact that Defendant Babwah was in custody from the inception of his encounter with Agents Aryai and Devine, his consents to the searches of both the BMW and the 107th Street residence were voluntarily given.

As in the *Moreno* case, Babwah was in a public area when he gave his consents; he was not in an interrogation room or a station-house. Like the defendant in *Moreno,* Defendant Babwah was not physically abused or verbally threatened. There was never any display of weapons by the agents. The consents to search the 107th street residence were given only a short time after the agents pulled the BMW over, not after a prolonged period of confinement or segregation from his traveling companions. Indeed, Babwah's willingness to consent to the search of the house is further evidenced by his signature on the consent form directly under the consent language, rather than further down the page on the line drawn by Agent Aryai. Babwah clearly had free will to consent to the search.

These facts persuade the Court that Babwah's consents to the searches were voluntary, and just as the Second Circuit found no *Miranda* rights violation in *Moreno,* for the reasons articulated by the *Moreno* court, this Court finds no *Miranda* rights violation with respect to Defendant Babwah.

### D. DEFENDANT MAHARAJ'S INCULPATORY STATEMENTS REGARDING THE IMPORTATION OF CASH MUST BE SUPPRESSED.

With respect to Defendant Maharaj, however, the Court finds that his un-*Mirandized* inculpatory statement to Agent Devine about his having brought $30,000 of currency into the U.S. at one time by using the assistance of some friends so they could break down the amounts of currency carried in by each of them into amounts of less than $10,000 must be suppressed.

The Fifth Amendment specifically protects citizens from the making of uncounseled incriminating statements which could later be used against them. This is the precise situation in this case with respect to Defendant Maharaj's *statement* to Agent Devine. The Court finds a distinct difference between Defendant Maharaj's statements and Defendant Babwah's because unlike Defendant Babwah, Defendant Maharaj who was also "in custody" *never* consented to *anything*—he did not consent to any search and he did not consent to answer questions—until *after* he was read his *Miranda* rights, which did not occur until *after* he made the inculpatory statement to Agent Devine.[9]

### IV. CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant Babwah's Motion to Suppress Evidence be, and hereby is, DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant Maharaj's Motion to Suppress Evidence is

GRANTED IN PART, and DENIED IN PART as follows:

Defendant Maharaj's statement to Agent Devine about his having brought $30,000 into the United States on one occasion with the assistance of some friends by having each person carry just under $10,000 into the country shall be SUPPRESSED.

With respect to all of the other evidence contested by Defendant Maharaj, his Motion is DENIED.

---

9. With respect to Defendant Maharaj and the *physical* evidence found in the 107th Street residence, since Defendant Maharaj denied living at the residence until *after* the agents found bank deposit slips with his name on it and the 107th Street address, he has no standing to contest the prior search of the premises or to challenge the admissibility of the evidence of the currency and bank deposit slips. Only Defendant Babwah had admitted that he lived at the premises prior to the discovery of the bank slips, thus, while he has standing to challenge the search, a defendant who is aggrieved by a search of a third party's property, the Fourth Amendment rights of *that* defendant have not been infringed. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).

To the extent that Maharaj may be deemed to have standing by virtue of his ultimate admission that he lived at the 107th Street residence *after* the agents discovered bank deposit slips that had his name and that address on them, because Defendant Babwah who also said he lived there validly consented to the search of the premises, Maharaj may not object to the search. *See, United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).