UNITED STATES of America, Appellee,

v.

Dylan Y. RODNEY, a/k/a Dylan Y. Jackson, Appellant.

No. 90–3189.

United States Court of Appeals, District of Columbia Circuit.

Argued March 18, 1991.

Decided Feb. 19, 1992.

M. Elizabeth Kent, Washington, D.C. (appointed by the Court), for appellant.

Linda Otani McKinney, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas J. Tourish, Jr. and William M. Blier, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, RUTH BADER GINSBURG, Circuit Judges, and THOMAS, Circuit Justice.*

Opinion for the Court filed by Circuit Justice THOMAS.

Dissenting opinion filed by Circuit Judge WALD.

THOMAS, Circuit Justice:

The principal question presented is whether a consent to a body search for drugs, without more, authorizes the sort of careful frisk described in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We hold that it does.

I

On February 17, 1990, Dylan Rodney stepped off a bus that had arrived in Washington, D.C., from New York City. As Rodney left the bus station, Detective Vance Beard, dressed in plain clothes and carrying a concealed weapon, approached him from behind. A second officer waited nearby. Beard displayed identification and asked if Rodney would talk to him. Rodney agreed.

Beard asked Rodney whether he lived in either Washington or New York. Rodney replied that he lived in Florida, but had come to Washington to try to find his wife.

She lived on Georgia Avenue, Rodney said, although he was unable to identify any more precise location.

Beard asked Rodney whether he was carrying drugs in his travel bag. After Rodney said no, Beard obtained permission to search the bag. As he did so, the other officer advanced to within about five feet of Rodney. The search failed to turn up any contraband.

Beard then asked Rodney whether he was carrying drugs on his person. After Rodney again said no, Beard requested permission to conduct a body search. Rodney said "sure" and raised his arms above his head. Beard placed his hands on Rodney's ankles and, in one sweeping motion, ran them up the inside of Rodney's legs. As he passed over the crotch area, Beard felt small, rock-like objects. Rodney exclaimed: "That's me!" Detecting otherwise, Beard placed Rodney under arrest.

At the police station, Beard unzipped Rodney's pants and retrieved a plastic bag containing a rock-like substance that was identified as cocaine base. Rodney was charged with possession and intent to distribute.

On April 10, 1990, Rodney moved to suppress the crack. Rodney argued (1) that he had not consented voluntarily to the body search; (2) that even if he had done so, the consent did not include a search of his crotch area; and (3) that his arrest was unsupported by probable cause.

The district court held a hearing and denied the motion, finding that Rodney had "[given] his consent voluntarily to [the] search [of] his person and belongings." *United States v. Rodney*, Crim. No. 90–0123, at 1 (D.D.C. Apr. 27, 1990). Rodney entered a conditional guilty plea, reserving the right to withdraw it if this court reversed the denial of his suppression motion.

II

■ Rodney first contends that the district court erred in finding that his consent to the body search was voluntary, and

---

* Justice Thomas was a member of this court when the case was briefed and argued and to-

day has been designated Circuit Justice for this court. *See* 28 U.S.C. §§ 42, 43(b).

therefore not prohibited by the Fourth Amendment. In determining the voluntariness of a consent, a district court must examine "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Relevant factors include:

> the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Id.* (citations omitted). We review only for clear error. *See United States v. Battista,* 876 F.2d 201, 207 (D.C.Cir.1989).

■ On this record, we find no clear error. On the one hand, some evidence suggests an involuntary consent. Rodney testified that he thought three, rather than two, officers were covering him; that the officers were much bigger than he; and that he was young (twenty-four) and relatively uneducated (to the tenth grade) at the time. He also testified that before the events leading to his arrest, he had had four unpleasant encounters with the police: each time he had refused their request to search him, but each time they had searched him anyway. On the other hand, Beard's testimony indicates that the police conduct here bore no resemblance to the sort of "aggressive questioning, intimidating actions, or prolonged police presence," *United States v. Brady,* 842 F.2d 1313, 1315 (D.C.Cir.1988), that might invalidate a consent. During the encounter, according to Beard, his gun was concealed; he wore plain clothes and spoke in a conversational tone; and no other officer came within five feet of Rodney. The district court could

have weighed Beard's evidence more heavily than Rodney's. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Thus, even assuming that the court credited Rodney's testimony in addition to Beard's, the court committed no clear error in finding the consent voluntary.[1]

### III

■ Rodney next argues that even if he consented voluntarily to the body search, he did not consent to the search of his crotch area. A consensual search cannot exceed the scope of the consent. The scope of the consent is measured by a test of " 'objective' reasonableness": it depends on how broadly a reasonable observer would have interpreted the consent under the circumstances. *See Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). Here, Rodney clearly consented to a search of his *body* for *drugs.* We conclude that a reasonable person would have understood that consent to encompass the search undertaken here.

■ Under *Jimeno,* "[t]he scope of a search is generally defined by its expressed object." *Id.* 111 S.Ct. at 1804. In this case, Rodney authorized a search for drugs. Dealers frequently hide drugs near their genitals. *See, e.g., United States v. Broxton,* 926 F.2d 1180, 1181 (D.C.Cir. 1991) (per curiam); *United States v. Wright,* 924 F.2d 545, 546 (4th Cir.1991); *United States v. Winfrey,* 915 F.2d 212, 215–16 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Wilson,* 895 F.2d 168, 170 (4th Cir.1990) (per curiam); *United States v. Agyen,* 842 F.2d 203, 204 (8th Cir.), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2021, 100 L.Ed.2d 608 (1988); *United States v. Lehmann,* 798 F.2d 692, 693 (4th Cir.1986). Indeed, Beard testified that his colleagues make up to 75 percent of their drug recov-

---

1. In finding Rodney's consent voluntary, the district court made no subsidiary findings of fact. Because Rodney failed to object to this omission (either in the district court or here), he has forfeited any claim he might otherwise have had under Fed.R.Crim.P. 12(e), which required the district court to "state its essential findings

on the record." Therefore, we must uphold the ultimate finding of voluntariness " 'if there is any reasonable view of the evidence that would support it.' " *United States v. Williams,* 822 F.2d 1174, 1177–78 n. 39 (D.C.Cir.1987) (citations omitted). As we have explained, we believe that there is such a view.

eries from around the crotch area. For these reasons, we conclude that a request to conduct a body search for drugs reasonably includes a request to conduct some search of that area.

Although *Jimeno* states the test "generally" used to determine the scope of a consent to search, we doubt that the Supreme Court would have us apply that test unflinchingly in the context of body searches. At some point, we suspect, a body search would become so intrusive that we would not infer consent to it from a generalized consent, regardless of the stated object of the search. For example, although drugs can be hidden virtually anywhere on or in one's person, a generalized consent to a body search for drugs surely does not validate everything up to and including a search of body cavities.

The search undertaken here, however, was not unusually intrusive, at least relative to body searches generally. It involved a continuous sweeping motion over Rodney's outer garments, including the trousers covering his crotch area.[2] In this respect, the search was no more invasive than the typical pat-down frisk for weapons described by the Supreme Court over two decades ago:

> "[T]he officer must feel with sensitive fingers every portion of the [defendant's] body. A thorough search must be made of the [defendant's] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet."

*Terry v. Ohio*, 392 U.S. 1, 17 n. 13, 88 S.Ct. 1868, 1877 n. 13, 20 L.Ed.2d 889 (1968) (citation omitted); *see United States v. Clipper*, 758 F.Supp. 756, 761 (D.D.C.1991) (noting that the police had discovered drugs in the defendant's crotch during a "routine pat-down or frisk"). In *Terry*, the Court explained that the typical pat-down frisk, though serious, "may realistically be characterized as something less than a 'full' search." 392 U.S. at 26, 88 S.Ct. at 1882. We conclude that the frisk of Rodney's fully-clothed body involved nothing so intrusive, relative to body searches generally, as to require a separate consent above and beyond the consent to a body search that Rodney had given voluntarily.

Our conclusion is consistent with the Eleventh Circuit's decision in *United States v. Blake*, 888 F.2d 795 (11th Cir. 1989), on which Rodney relies heavily. In *Blake*, the officer performed a direct " 'frontal touching' " of the defendant's private parts. *Id.* at 797 (citations omitted). The Eleventh Circuit found no clear error in the district court's invalidation of that search. In so doing, however, it expressly left open the question whether "the traditional frisk search, described in *Terry* " would have been encompassed within the scope of the consent given there. *See id.* at 801 & n. 13. We hold only that Rodney's generalized consent authorized the kind of "traditional frisk search" undertaken here, and we express no view on questions involving putatively consensual searches of a more intrusive nature.[3]

## IV

■ Finally, Rodney asserts that Beard did not have probable cause to arrest him after feeling the small, rock-like objects near his groin. A warrantless arrest in a public place must be supported by probable cause. *See, e.g., United States v. Lucas*, 778 F.2d 885, 887 (D.C.Cir.1985). "[P]robable cause exists if the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, would lead that police officer to believe that a criminal offense has been or is being committed." *United States v. Green*, 670 F.2d 1148, 1152 (D.C.Cir.1981).

---

**2.** At the suppression hearing, Rodney mimicked the search. Without objection, the prosecutor asked for the record to reflect that Rodney "ran both his hands from the base of his feet or ankle area up through the interior of his legs and including the crotch area with one motion." Tr. 30 (Apr. 27, 1990).

**3.** In particular, we do not address situations where, unlike here, the officer and the suspect are of opposite sexes.

■ Beard, a police officer for more than twenty years, arrested Rodney after witnessing several curious events. First, Rodney gave Beard the improbable story that he had come to Washington to find his wife, who lived at an address unknown to him. *Cf. United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) (finding reasonable suspicion to stop in part because of "inappropriately vague answers to questions about [the suspect's] destination and host"). Then, Beard felt small rock-like objects hidden near Rodney's crotch, which, Beard detected, were not part of Rodney's body. Finally, when Rodney falsely declared that they were, Beard logically concluded that Rodney was likely carrying drugs.

## V

We conclude that Rodney voluntarily consented to a search of his body for drugs, which encompassed the frisk undertaken here. As a result of that frisk, we conclude further, Beard had probable cause to arrest Rodney. Accordingly, the judgment of conviction is

*Affirmed.*

WALD, Circuit Judge, dissenting as to Part III:

I disagree with the panel ruling that a citizen's consent to a search of his "person" on a public thoroughfare, given in response to a police request made in the absence of probable cause or even "reasonable suspicion" to believe that he has committed a crime, encompasses authority to conduct a palpation of the person's genital area in an effort to detect drugs. Because I believe that in this case such an intimate and intrusive search exceeded the scope of any general permission to search granted, I would find the search nonconsensual and the drugs seized inadmissible.

The majority uses the test for scope of consent to search set out in *Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991), which dealt with the search of a car, *i.e.,* "the scope of a search is generally defined by its expressed object." It reasons therefrom that since the search here was for drugs, and drugs are frequently secreted in the crotch of carriers, a citizen's permission to search his "person" in public automatically includes the genital area. The majority goes on to acknowledge, however, that "we doubt the Supreme Court would have us apply the [*Jimeno* ] test unflinchingly in the context of body searches." Majority opinion ("Maj. op.") at 297. The majority realizes that, applied "unflinchingly," the *Jimeno* test could encompass disrobing, and even more intimate probings than were attempted here, and that such consequences would be unacceptable, if not unthinkable, in our society. Thus they say that "at some point" a body search would become so intrusive as not to come within a generalized consent, and that point might be reached in an "everything up to and including a search of body cavities." But, the majority concludes, "a continuous sweeping motion over Rodney's outer garments, including ... his crotch area" fell short of that taboo. Maj. op. at 298. Such a search is no more invasive, they say, than the typical pat-down that accompanies a *Terry* stop-and-frisk. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). And finally, the majority distinguishes the search here from the situation in *United States v. Blake,* 888 F.2d 795 (11th Cir. 1989), where the Eleventh Circuit found a search involving a "frontal touching" of the genital area not included within a general consent to search, although leaving open the question of whether the traditional *Terry* frisk search would be.

I share the majority's reticence to extend to body searches the "scope equals object" test for consent. The Supreme Court has historically recognized that privacy interests of a person in her body are far greater than in the space that surrounds her or the property in her possession or control. *See Schmerber v. California,* 384 U.S. 757, 767–68, 86 S.Ct. 1826, 1833–34, 16 L.Ed.2d 908 (1966) (noting that although fourth amendment makes no distinction between its protection of "persons, houses, papers and effects ..." intrusions upon the human body are treated differently from "state

interferences with property relationships or private papers—'houses, papers, and effects' "); *Winston v. Lee*, 470 U.S. 753, 761–62, 105 S.Ct. 1611, 1617–18, 84 L.Ed.2d 662 (1984) (noting that "intrusions upon the individual's dignitary interests in personal privacy and bodily integrity" are different from intrusions into living room, eavesdropping on telephone conversations, or restricting person's mobility); *see also Cruzan v. Director, Missouri Dept. of Health,* — U.S. —, 110 S.Ct. 2841, 2856, 111 L.Ed.2d 224 (1990) (O'Connor, J., concurring) (noting special treatment in fourth amendment jurisprudence of human body). As the *Jimeno* Court phrased it: "the standard for measuring the scope of a [defendant]'s consent under the Fourth Amendment is that of 'objective reasonableness'— what would the typical reasonable person have understood by the exchange between the officer and the [defendant]?" *Jimeno*, 111 S.Ct. at 1803–04. Thus while it may be "objectively reasonable" to expect that a citizen who consents to the search of his car for drugs means to include all spaces in his car where drugs might be hid, it is not "objectively reasonable" to expect that a citizen on a public street who consents to a police search anticipates that all potential hiding places for drugs in his body including the genital area, or in the case of a woman, her breasts and genital area, will be manually searched. Far more likely, I suspect, is that the cooperative citizen anticipates a pat-down of the outside surfaces of the body and an emptying of pockets. Anything more intimate than that inevitably invokes the expectation of a more private place to which the citizen would be taken, *i.e.,* a bathroom or separate enclosure, which in turn would require an additional consent from the citizen to go there. The majority's reliance on the fact that this kind of "body search" is less intrusive than other kinds, *i.e.,* cavity searches and strip searches, therefore becomes largely irrelevant because those more intrusive searches would never in anyone's wildest imagination be expected to take place on a public street.

Furthermore, it does not move our inquiry ahead to say, as the majority does, that a frisk of a person's genitals through his clothing is not a "full search" (whatever that means), or that a "fully-clothed" body search is "not unusually intrusive ... relative to body searches generally." Maj. op. at 298. The issue before us is whether a person against whom there is no articulable suspicion of wrongdoing who is asked to submit to a body search on a public street expects that search to include manual touching of the genital area.

I do not believe any such expectation exists at the time a cooperative citizen consents to an on-the-street search. Rather, that citizen anticipates only those kinds of searches that unfortunately have become a part of our urban living, searches ranging from airport security personnel passing a hand-held magnometer over a person's body, to having a person empty his pockets, and subject himself to a patting-down of sides, shoulders, and back. Any search that includes touching genital areas or breasts, would not normally be expected to occur in public.

In all aspects of our society, different parts of the body are subject to very different levels of privacy and expectations about intrusions. We readily bare our heads, arms, legs, backs, even midriffs, in public, but, except in the most unusual circumstances, certainly not our breasts or genitals. On the streets, in elevators, and on public transportation, we often touch, inadvertently or even casually, each others' hands, arms, shoulders, and backs, but it is a serious affront, and sometimes even a crime, to intentionally touch another's intimate body parts without explicit permission; and while we feel free to discuss other people's hair, facial features, weight, height, noses or ears, similar discussions about genitals or breasts are not acceptable. Thus in any consensual encounter, it is not "objectively reasonable" for a citizen desiring to cooperate with the police in a public place to expect that permission to search her body includes feeling, even "fully clothed," the most private areas of her body. Under our social norms that requires "special permission," given with notice of the areas to be searched.

The majority dismisses the search here as not intolerable, however, because similar searches occur, even in public, pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868. First of all, *Terry* itself conceded that the search it authorized constituted "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." 392 U.S. at 17, 88 S.Ct. at 1877; *accord United States v. Blake*, 888 F.2d at 801 (Shoob, J., concurring) (describing search of genital area without explicit consent as "outrageous[ ] conduct" by police officers, likely to lead to "fists thrown by indignant [persons] subjected to these searches"). Second, it is well to remember why the Court found such an intrusive public search to be permissible in certain circumstances: it was to protect the officer from ambush by hidden weapons in the custody of a person reasonably suspected of a crime. As the Supreme Court put it:

> The crux of this case ... is ... whether there was justification for [the officer's] invasion of Terry's personal security by searching him for weapons. We are now concerned with more than the governmental interest in investigating crime; ... there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.

*Terry*, 392 U.S. at 23, 88 S.Ct. at 1881. In consensual searches of citizens against whom there is no suspicion of crime, there is correlatively no comparable need for the officer to protect himself by doing a weapons pat-down. And even the kind of weapons search described in *Terry* must by its very nature be less intimate and intrusive than the manual search of a person's genital area for any small bump which might turn out to be a glassine envelope or a small rock of crack. In sum, *Terry* does

not purport to define the limits of a cooperating citizen's right to privacy; it defines the balance between a suspect's right to privacy and the need of the police to protect themselves from ambush. The *Terry* authorization cannot, therefore, provide the safe haven for the police search of the intimate body parts of an ordinary citizen against whom there is no suspicion of crime.

Nor can the mere fact that drug couriers often hide their stash in the crotch area justify the search of such area without some elementary form of notice to the citizen that such an offensive procedure is about to take place. The ordinary citizen's expectation of privacy in intimate parts of her body is certainly well enough established to merit a particularized request for consent to such an intimate search in public. The Eleventh Circuit so found, and I do not find my colleagues' attempt to distinguish that case persuasive. Whether the "touching" begins in the genital area, or ends up there after an initial "sweep" along the legs hardly seems material to the intensity of the intrusion; and indeed we cannot be sure at all from the record here that this search was really the equivalent of a *Terry* pat-down, which the *Blake* court did not reach; or something more intrusive. In any case, I agree with Judge Shoob's concurring opinion in *Blake* that "intimate searches may not occur as part of random stops absent explicit and voluntary consent." 888 F.2d at 801 (Shoob, J., concurring).

Although the Supreme Court said in *Schneckloth v. Bustamonte*, 412 U.S. 218, 230–31, 93 S.Ct. 2041, 2049–50, 36 L.Ed.2d 854 (1973), that the fourth amendment does not require a "knowing waiver" of the *right to refuse* as a prerequisite to a valid consent to search, that case does not purport to lay down the ground rules for noticing a knowing consent of an intimate body search.[1] Minimally, in my view, fourth

---

1. For example, in tort law, a physician who touches parts of the body to which the patient has not consented, subjects himself to an action for common-law battery. The doctrine of informed consent begins with the general princi-

ple that a physician must obtain the patient's consent before touching any parts of the patient's body. For the consent to be valid, it must be voluntary and informed, *i.e.*, the doctor must explain the details of the procedure, and

amendment protection of a nonsuspect citizen's reasonable expectations of privacy requires that the police indicate that the search will entail a touching of private areas. *See* Anthony Amsterdam, *Perspectives on the Fourth Amendment,* 58 MINN. L.REV. 349, 390 (1974) (advocating that "the protection of the amendment be graduated, imposing lesser or greater restraints upon searches and seizures in proportion to their intrusiveness and to the sanctity of the interests they invade").

A general consent to a search of a citizen's "person" in a public place, does not include consent to touch the genital or breast areas. The majority today upholds a practice that allows police under the rubric of a general consent to conduct intimate body searches, and in so doing defeats the legitimate expectations of privacy that ordinary citizens should retain during cooperative exchanges with the police on the street. I believe the search was impermissible under the fourth amendment, and the drugs seized should have been suppressed.

accurately describe those parts of the body that will be intruded upon. *See* Fowler Harper, Fleming James & Oscar Gray, *The Law of Torts,* § 3.10, at 301 & n. 20 (2d ed. 1986); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32, at 189–92 (5th ed. 1984).