UNITED STATES of America, Appellant

v.

Pedro Jolio PRANDY–BINETT.

No. 91–3296.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 22, 1993.

Decided May 11, 1993.

Peggy Kuo, Asst. U.S. Atty., argued the cause for appellant. With her on the briefs were Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher and Thomas C. Black, Asst. U.S. Attys. Thomas J. Tourish, Jr. also entered an appearance for appellant.

A.J. Kramer, Federal Public Defender, argued the cause and filed the brief for appellee.

Before: EDWARDS, D.H. GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

RANDOLPH, Circuit Judge:

Some opaque containers induce assumptions about their contents. Refrigerators contain food. Under the hoods of automobiles are engines. These are predictions, based on experience. Narcotics officers have their own specialized experience and training. Detective John Centrella saw a small rectangular block wrapped in silver duct tape. To the uninitiated, the object's outward appearance said nothing about its contents. To Detective Centrella, the size, shape and wrapping of the object signified one kilogram of illegal narcotics. The question is whether Pedro Jolio Prandy–Binett's possession of the object, together with other information, gave the detective probable cause to arrest him.

Detective Centrella and another narcotics detective were on duty at Union Station, meeting trains arriving from New York City, a "source city" for drugs. As they watched departing passengers, their attention was drawn to an individual walking through the station faster than the others and trying to get around them. When the individual—Prandy–Binett—made eye contact with the detectives, who were in plain clothes, he moved even more quickly toward the exit. The detectives approached him and identified themselves. After telling the officers he had come from New Jersey, Prandy–Binett produced a one-way train ticket, purchased with cash, showing that his trip originated at Penn Station, New York City. After saying he lived in Washington, D.C., he handed the officers a driver's license showing Hyattsville, Maryland, as his residence. Detective Centrella's suspicions, aroused by these possible inconsistencies, were heightened by the cloth "tote" or "gym" bag Prandy–Binett car-

ried on his shoulder. Prandy–Binett reported having spent a week working in New Jersey. Yet his only luggage was the small bag, which did not appear full. Asked whether the bag contained drugs or guns, Prandy–Binett said no. Detective Centrella then requested permission to search the bag. Prandy–Binett replied that he did not have to consent and that the bag contained only clothing.[1] He took the bag from his shoulder, placed it on the ground, knelt down (as did the detective next to him), unzipped the bag and began pulling out a pair of blue jeans. This action uncovered a miniature shopping bag lying on its side, deep purple in color, a "perfume or a cologne bag" from Elizabeth Taylor Perfume. Unprompted, Prandy–Binett said, in evident reference to the perfume bag, "this is a gift." As Prandy–Binett continued to manipulate the blue jeans, a portion of a rectangular block, wrapped in silver duct tape, slid out of the perfume bag. Believing the block to contain illegal drugs, Detective Centrella handcuffed Prandy–Binett, examined the wrapped object further, and seized it and the gym bag. A later field test on the contents of the wrapped block revealed cocaine.

A single-count indictment charged Prandy–Binett with possession with intent to distribute 500 or more grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii). After an evidentiary hearing, the district court held that the detectives had violated Prandy–Binett's Fourth Amendment rights. The government sought to justify

the seizure and search of the wrapped block as incident to a valid arrest.[2] The district court found that Prandy–Binett was arrested immediately after the detectives observed part of the wrapped block. At that point, the court held, the detectives did not have probable cause to believe Prandy–Binett had committed an offense. The exclusionary rule therefore demanded suppression of the cocaine as the fruit of the illegal arrest. 774 F.Supp. at 28. Relying on the testimony of the government's expert, the court stated "that the proper approach" would have been "to investigate further, not to immediately arrest the defendant." *Id.* At a status call after the district court issued its written opinion, the government acknowledged that it could not proceed without the suppressed evidence, and the court dismissed the indictment. This appeal followed.

Somewhere between " 'less than evidence which would justify . . .' conviction" and "more than bare suspicion," probable cause is satisfied. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) (citation omitted). The precise point is indeterminate. We are concerned not simply with probabilities, but with conditional probabilities: if one event occurs, how likely is it that another event will occur?[3] This is why the detectives' observations up to the time the block slipped out of the perfume bag cannot be disregarded. It is why in similar cases we ask, although sometimes tacitly, what is the probability that a train passenger arriving at Union Station from

---

1. Prandy–Binett testified that the detectives forced him to unzip the bag. In light of its disposition of the suppression motion, the district court found it unnecessary to decide whether the defendant voluntarily opened his bag. *See United States v. Prandy–Binett,* 774 F.Supp. 25, 26 n. 1 (D.D.C.1991). We intimate no view on the subject.

2. Apparently both parties and the district court (*see Prandy–Binett,* 774 F.Supp. at 28 n. 2) believed that if Prandy–Binett was lawfully arrested, no further constitutional problem arose from the officer's warrantless seizure and later search of the wrapped block. *Compare United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977); *United States v. Six Hundred Thirty–Nine Thousand Five Hundred and Fifty–Eight Dollars in United States Currency,* 955 F.2d 712, 717–18 (D.C.Cir.1992). The idea may

be that the package itself could not "support any reasonable expectation of privacy because [its] contents can be inferred from [its] outward appearance." *Arkansas v. Sanders,* 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979), *overruled, California v. Acevedo,* —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). *See generally United States v. Williams,* 822 F.2d 1174, 1181 (D.C.Cir.1987). Given the unanimity of views of this subject, we see no reason to pursue it further.

3. Thus courts often refer to the need to consider "the totality of the circumstances" in evaluating probable cause. *See, e.g., Illinois v. Gates,* 462 U.S. 213, 230–38, 103 S.Ct. 2317, 2328–32, 76 L.Ed.2d 527 (1983); *United States v. Chin,* 981 F.2d 1275, 1278 (D.C.Cir.1992); *United States v. Rodney,* 956 F.2d 295, 298–99 (D.C.Cir.1992).

New York City will be carrying cocaine? Quite low, we trust, despite New York's status as a source city for narcotics. Is the probability increased if the passenger moves quickly through the station after leaving the train? Greater if the passenger also gives apparently deceptive answers when the police question him? Greater still if the passenger opens his bag and refers to a package wrapped in duct tape inside a fancy perfume bag as a "gift?" Neither courts nor law enforcement officers, nor anyone else for that matter, can quantify any of this. A mathematician could not perform the calculations because there is no way of assigning probabilities to the individual events. The information is simply unavailable, as will doubtless be true in every Fourth Amendment case. Still, we are convinced that, up to the sighting of the duct tape package, the conditional probability was low, much too low to have satisfied the Fourth Amendment in light of the interests it protects.

The case thus comes down to the detectives' inference of narcotics from the appearance of the wrapped block, and the extent to which that inference enhanced the probability of Prandy–Binett's possessing drugs. We put the question in these terms because "probable cause" is evaluated not only from the perspective of a "prudent man," *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 224, 13 L.Ed.2d 142 (1964), but also from the particular viewpoint of the officer involved in the search or seizure. *See, e.g., Texas v. Brown*, 460 U.S. 730, 742–43, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion); *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *Johnson v. United States*, 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948); *United States v. Davis*, 458 F.2d 819, 821–22 (D.C.Cir.1972). *See generally* 1 W. LaFave, Search and Seizure § 3.2(c) (2d ed. 1987). Law enforcement officers naturally reach conclusions based on their training and experience. In cases of searches or seizures without warrants, the court's role is to decide whether the officer's inference from the facts was "reasonable," *United States v. Ortiz*, 422 U.S. at 897, 95 S.Ct. at 2589. This depends on information showing the officer's accumulated knowledge of criminal activity, information that must be in the record if it is to be considered.

Upon seeing the kilo-sized rectangular package wrapped in silver duct tape sticking out of the perfume bag, Detective Centrella and his partner immediately concluded that it held narcotics. Detective Centrella testified: "As soon as I saw that, in my mind, that's drugs." The record firmly supports the detective's inference.

There was first the block's bulk. The weight of consumer goods in this country is usually described in pounds and ounces. Perhaps because of foreign influence, the weight of illicit narcotics is usually measured—in statutes and on the street—in terms of the metric system. The evidence showed that in the drug trade, a kilogram of cocaine or heroin is a standardized unit of exchange, commonly referred to as a "kilo brick" or simply a "kilo." (A kilogram equals 2.2046 pounds.) Detective Centrella was quite familiar with the bulk of packages containing one kilogram of cocaine. During his 20 years of service, he personally had seized 100 such kilos and had seen many more. Both Detective Centrella, and his partner, an experienced narcotics detective who had undergone training at the Drug Enforcement Administration, thus had good reason for believing that the wrapped block in Prandy–Binett's gym bag was about the size of a package containing one kilogram of cocaine or heroin.

The second consideration was the rectangular shape of the object. The portion protruding from the perfume bag was consistent with what the detectives knew to be the standard configuration, the typical "kilo brick." The bag itself, roughly four inches wide and between six and ten inches deep, was the right size for holding a kilo of narcotics so packaged. The brick-like shape of the object thus further alerted the detectives, in light of their training and experience, to the possible presence of narcotics.

The third factor was wrapping—silver duct tape (over plastic). Duct tape is attractive to

traffickers because fingerprints are difficult to lift from its surface and because some criminals believe—erroneously—that it masks the odor of the drugs from police dogs. Detective Centrella testified that he had seen "several hundred" packages wrapped in silver duct tape similar in appearance to the one in Prandy–Binett's bag. Every one contained contraband. He also reported that approximately 95 percent of the kilogram-sized quantities of cocaine he had seized in his career were so packaged. The detective who accompanied Detective Centrella, and the government's expert witness, also had extensive familiarity with duct-tape packages of narcotics. Detective Centrella's experience replicates that of narcotics agents in New York City. The agent in *United States v. Barrios–Moriera*, 872 F.2d 12, 17 (2d Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989), "had participated in the seizure of three or four hundred separate kilos of cocaine," which were typically "wrapped in some variety of tape." The Second Circuit therefore held that "the rectangular package, measuring a certain size, wrapped in duct tape" proclaimed its illicit contents, so much so that the agent legally seized it without a warrant as contraband in plain view. *Id.*

To Detective Centrella the wrapped block thus conveyed the message "one kilo of narcotics" just as surely as if the words were written on the tape. The circumstances leading up to the arrest and the incongruity of the crudely wrapped block inside the fancy perfume bag, together with Prandy–Binett's unsolicited disclaimer "This is a gift," must have confirmed what the detective saw in his mind's eye. The record shows that the detective had a solid foundation from which to evaluate relative frequency, to judge the percentage of times such packages hold narcotics. Contrast *Robbins v. California*, 453 U.S. 420, 428, 101 S.Ct. 2841, 2846, 69 L.Ed.2d 744 (1981) (plurality opinion). Of the hundreds of packages of this type Detective Centrella had seen in his 20 years as a narcotics officer, every one contained drugs. Not once, in all his years as a narcotics officer, had he encountered a duct-taped package containing something other than drugs. No *evidence* indicated with what frequency, if any, packages of such bulk and configuration with the same sort of wrapping as Prandy–Binett's held other material. While it is doubtless safe to assume there are such innocent packages, we—unlike Detective Centrella—have no basis, no foundation derived from experience, to make a judgment about their relative frequency anywhere, let alone at Union Station hidden in a bag carried by a passenger departing from New York who seemed to be giving deceptive answers to police questions. We cannot say exactly how probable it was that the block contained drugs, but we are convinced that it amounted, at the least, to a " 'fair probability' " Prandy–Binett was committing an offense. *United States v. Caroline*, 791 F.2d 197, 201 (D.C.Cir.1986) (*quoting Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

The district court stated that in answer to its hypothetical about a person of the judge's description carrying a duct-taped package in Union Station, "both arresting officers testified that no arrest would have been made." 774 F.Supp. at 28 n. 3. There is a bit more to it. The government's expert, after first saying he would arrest the person, said that on second thought he would perform a field test first and then make the arrest. Context makes it uncertain what the expert meant by "arrest." His second thought seemed to be that he would first place the person in custody and, after determining which illicit substance the package contained, make a formal arrest either for possession of cocaine or heroin. The question was not put to Detective Centrella. In any event, we do not view the court's hypothetical as an irresistible counter-example. The detective's partner, who said he would not make an arrest without investigating further, was asked only what he would do if a person fitting the judge's description were "walking" through the station carrying the wrapped block. None of the other circumstances was included—the passenger's arrival from New York City, his manner of walking quickly through the station and speeding up when he learned he was being watched, his apparently deceptive answers to the detectives' questions, the carrying of the block inside a perfume bag in

a gym bag too small to accommodate much clothing or other personal effects. The prosecutor, in a follow-up question, tried to expand the hypothetical to include these circumstances, but the court sustained an objection. Furthermore, the court's hypothetical says nothing whatever about relative frequency, an essential factor in any evaluation of probable cause. As we have said, when one asks how often people carry duct-tape-wrapped packages of this size containing something other than drugs, the record suggests the answer never. While we sense that this is an overstatement, intuition cannot overcome the hard evidence of experienced detectives who have encountered hundreds of such objects.

Although not decisive, it is worth noting that in assessing probable cause the Supreme Court too has credited police officers' inferences about the contents of an object from its distinctive packaging. In *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion), a police officer believed from his experience that "an opaque, green party balloon, knotted about one-half inch from the tip" he spied in plain view in a suspect's car was likely to contain narcotics. *See* 460 U.S. at 733–34, 103 S.Ct. at 1538–39. The plurality in *Brown* held that the officer's inference from the characteristic appearance of the balloon, when combined with other signs of drug paraphernalia spotted in the car, provided probable cause to seize the balloon, *id.* at 742–43, 103 S.Ct. at 1543, a conclusion all nine members of the Court joined. *See id.* at 746, 103 S.Ct. at 1545 (Powell, J., concurring in the judgment); *id.* at 750, 103 S.Ct. at 1547 (Stevens, J., concurring in the judgment). *See also Robbins v. California*, 453 U.S. 420, 427, 101 S.Ct. 2841, 2846, 69 L.Ed.2d 744 (1981) (plurality opinion); *Arkansas v. Sanders*, 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979); *Henry v. United States*, 361 U.S. 98, 104, 80 S.Ct. 168, 172, 4 L.Ed.2d 134 (1959). This court also has relied upon the demonstrated expertise of police officers in recognizing distinctive packaging used in the drug trade for smaller quantities. We have credited officers' recognition of: "a package resembling narcotics," *United States v. Thornton*, 733 F.2d 121, 127 (D.C.Cir.1984);

a distinctive "brown 'change-type' bag," *United States v. Russell*, 655 F.2d 1261, 1262–63 (D.C.Cir.1981), *modified*, 670 F.2d 323 (D.C.Cir.), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982); a rectangular tinfoil packet, *United States v. Thomas*, 551 F.2d 347, 348 (D.C.Cir.1976) (per curiam); a "cream-colored envelope," *United States v. Brown*, 463 F.2d 949, 950–51 (D.C.Cir.1972); and an unsealed brown envelope, *United States v. Wheeler*, 459 F.2d 1228, 1229 (D.C.Cir.1972). *See also United States v. Berry*, 463 F.2d 1278, 1284–85 (D.C.Cir.1972) (distinctive appearance of small packages used by gamblers to transport numbers slips). In each of these cases, as in this one, there was "evidence of record" describing the arresting officer's experience with the particular packaging.

The district court was evidently troubled by the fact that without further investigation (presumably a field test), the officers could not know whether Prandy–Binett's crime was possession of heroin or possession of cocaine. *See* 774 F.Supp. at 28. We do not share the court's concern. It is hard to see how a field test could be conducted without seizing the block and opening it, actions which themselves would presumably require probable cause. If officers have probable cause to go that far, we do not understand why they would not also have probable cause to arrest the person possessing the item before field testing it. Furthermore, the court's theory proves too much. If Prandy–Binett's perfume bag held clear ziplock bags containing white powder, the detectives also would not have been sure whether he possessed cocaine or heroin (or some innocuous substance). Yet that cannot be a reason for finding no probable cause. *See United States v. Jacobsen*, 466 U.S. 109, 121–22, 104 S.Ct. 1652, 1660–61, 80 L.Ed.2d 85 (1984). It is simply not the law that officers must be aware of the *specific* crime an individual is likely committing. *See, e.g., United States v. Anderson*, 923 F.2d 450, 457 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 1633, 113 L.Ed.2d 729 (1991); *United States ex rel. Frasier v. Henderson*, 464 F.2d 260, 263 (2d Cir.1972). It is enough that they have probable cause to believe the defendant has committed one or

the other of several offenses, even though they cannot be sure which one. The police may arrest an armed individual running from a store in the dead of night while the burglar alarm is sounding, even though they cannot be certain whether the suspected crime is attempted burglary, burglary, attempted robbery, robbery or unlawful possession of a firearm.

The orders of the district court suppressing the evidence and dismissing the indictment are reversed.

*So ordered.*

HARRY T. EDWARDS, Circuit Judge, dissenting:

The so-called "War on Drugs" has produced a gross distortion of the case law in our criminal jurisprudence.[1] This case graphically illustrates the worst effects of this distortion.

This case is about the significance of "duct tape," and whether its mere appearance on a portion of an unidentified package, without more, gives police officers probable cause to *arrest* a person. The majority, relying on a bizarre theory of "conditional probabilities," holds that probable cause can be based on the appearance of duct tape. In so holding, the majority reverses the decision of the District Court, while totally ignoring the factual findings of the trial judge. This judgment is truly a travesty of justice.

## I. *Introduction*

The defendant in this case aroused the suspicions of police officers at Union Station, because, according to the majority, he was seen "walking through the station faster than ... others and trying to get around them." [I have on many occasions rushed to get home upon disembarking from a train at Union Station. It has never occurred to me that my behavior was suspicious.] The officers' suspicions were aroused even further, we are told, because the defendant made eye contact with the officers and then "moved

even more quickly toward the exit." [One wonders what the "eye contact" revealed, because the detectives were in *plain clothes* and thus were not identifiable as police officers.] Proceeding on an ill-defined "hunch," and nothing more, the detectives approached the defendant, made some innocuous inquiries, and asked to search his gym/tote bag. As the defendant was fumbling through his bag, the officers noticed duct tape on a *portion* of a package that they saw in the bag. Although neither the entire package, nor its size, nor its contents could be seen, the officers decided that *the appearance of "duct tape" on a package was probable cause to justify the defendant's arrest.* The officers then arrested the defendant, handcuffed him and seized his gym bag. [This is an amazing scenario to me, because I have wrapped packages in duct tape, carried them in a tote bag in train stations, and never once thought that I might be subject to *arrest.*]

If a citizen can be *arrested* by police officers on nothing more than this, then our system of justice has become a farce. "Probable cause" now means that police officers can act solely on a "hunch" or "intuition," which, as here, will be characterized by the court as "specialized experience and training." And if the hunch proves to be correct and the arrest bears fruit, the court will hold, as here, that "the record firmly supports the detective's inference." This is a sham.

What is most astonishing about this case is that, on the facts at hand, it is far from clear that the police officers had enough even to justify a *"Terry-stop," Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968) (holding that a person may be stopped and frisked by a police officer for investigative purposes so long as the officer is acting pursuant to a reasonable, articulable suspicion), much less an *arrest!* Indeed, the absurdity of the situation is highlighted by an exchange between the trial judge and one of the arresting officers:

> THE COURT: If you saw me walking through the train station with a brick bag

1. *See generally United States v. Harrington,* 947 F.2d 956, 963–71 (D.C.Cir.1991) (Edwards, J., concurring); *United States v. Tavolacci,* 895 F.2d 1423, 1430–31 (D.C.Cir.1990) (Edwards, J., dis-

senting); Edwards, *The Judicial Function and the Elusive Goal of Principled Decisionmaking,* 1991 Wis.L.Rev. 837, 839–41.

like, a cube with some tape on it like that, would you come up and arrest me for carrying narcotics?

> THE WITNESS: I would certainly come up and do an investigation?

> THE COURT: But would that be enough to arrest me?

> THE WITNESS: No, sir.

Transcript of Motion to Suppress ("Tr.") 48–49, *United States v. Prandy–Binett,* 774 F.Supp. 25 (D.D.C.1991).

The tragedy in this case is not that the defendant was snared by the police. If the truth be told, we are probably not the least bit unhappy that he and his illicit drugs were removed from the streets. The tragedy is that the techniques used to snare this defendant were flatly at odds with the Constitution. In endorsing this conduct by the police, the majority gives officers license to snare guilty and innocent persons, alike, with no regard for their rights to be left alone in the absence of articulable suspicion or probable cause. The real harm done is not fully apparent, because we usually do not hear of the cases of the innocent people who are stopped by the police.[2] At bottom, the situation is nothing short of intolerable.

> It may be that the pressures of the docket are driving our decisions in this area, especially in cases that reveal the threats of the illegal drug trade. But we cannot permit rules designed to assist police officers in responding to these threats to take on a life independent of constitu-

tional measure. Constitutional caution must rise above fear and above even the legitimate desire to defend against societal dangers. Like other provisions in the Bill of Rights, the Fourth Amendment guarantee that police personnel cannot block and burden the movement of citizens without good *reason* for doing so is perhaps most urgently to be protected when it is least popular. Such protection is the proper province of the judicial branch of government. By discharging this obligation, the judiciary helps to preserve the enjoyment of individual liberty, which this country has from its earliest days held up as its ideal.

> To some there may seem to be a comfortable distance between the pressing everyday efforts of law enforcement officials to thwart drug trafficking and any threat those officials might pose to vital Fourth Amendment freedoms. Yet, it is when we ignore the proximity of the two that we come closest to destroying the balance of order and liberty that our Constitution demands. If we continue on our current course, we may soon embrace a doctrinal conclusion that armed agents of the law can block the free movement of citizens for any reason or for no reason, with or without reasonable articulable suspicion. Surely the Constitution does not permit such a result.

*Tavolacci,* 895 F.2d at 1430–31 (footnote omitted).

---

2. The circumstances that *actually* arouse police "suspicion" are obvious to anyone who bothers to look—individuals travelling through Union Station who are evidently poor, or people of color, are the individuals who are approached, questioned, stopped and searched. *See* Sheri Lynn Johnson, *Race and the Decision to Detain a Suspect,* 93 YALE L.J. 214, 225–37 (1983) (describing the varied uses of race as a motivation for police detention, and as an element in probable cause and reasonable suspicion analyses); *Developments in the Law: Race and the Criminal Process,* 101 HARV.L.REV. 1472, 1496 (1988) (noting studies that reveal that "police use race as an independently significant, if not determinative, factor in deciding whom to follow, detain, search, or arrest") (footnotes omitted); Emily J. Sack, *Police Approaches and Inquiries on the Streets of New York: The Aftermath of* People v. DeBour, 66 N.Y.U.L.REV. 512, 537–41 (1991) (de-

scribing police use of race as a factor to distinguish possible suspects in one jurisdiction).

This court's acquiescence in police interdiction techniques is repugnant to its responsibility to ensure that the Fourth Amendment provides *meaningful* protection to all Americans. *See* Tracey Maclin, *The Decline of the Right of Locomotion: The Fourth Amendment on the Streets,* 75 CORNELL L.REV. 1258, 1324–27 (1990) (arguing that the judiciary should not "blindly accept the government's claims" regarding the bases of police suspicions when those claims "come at the expense of constitutional values"); *Race and the Criminal Process, supra,* at 1507 (noting that modern Fourth Amendment jurisprudence insulates police use of race from judicial scrutiny, and that "race almost never is treated as an issue in cases in which race likely played a major role in the challenged police action").

On the facts of this case, the District Court's suppression of the evidence was eminently correct. Accordingly, I dissent.

## II. *Analysis*

This should have been a simple case. The Government's testimony at the suppression hearing revealed that on May 22, 1991, Detectives John Centrella and Jeffrey Huffman, dressed in plain clothes, were watching passengers arriving at Union Station from New York City. Centrella testified that Prandy–Binett, walking faster than the other passengers leaving the train, made eye contact with the officers, and then began to walk more quickly towards the exit. Centrella approached Prandy–Binett, identified himself, and proceeded to interview him. When asked if he had a train ticket, Prandy–Binett replied "No," and tapped his pockets as if he were looking for it. When asked where he was going, Prandy–Binett responded that he was visiting a friend who lived on 14th Street, and that he had just travelled from New Jersey, where he had been working for a week, to Washington, where he lived. Prandy–Binett then produced a train ticket, which showed that he had boarded the train in New York City. In response to Centrella's request for identification, Prandy–Binett produced a driver's license that showed his address to be in Hyattsville, Maryland. Tr. 6–12.

After this brief interview, Centrella explained to Prandy–Binett that he worked for the drug interdiction unit, and asked him if he were carrying guns or drugs in his bag. Prandy–Binett said "No," at which point Centrella asked if he could search his bag. Prandy–Binett said "Yes," although he told Centrella that he did not have to reveal the contents of the bag. Prandy–Binett then removed the bag from his shoulder, placed it on the ground, knelt down, and started to unzip it. Centrella knelt down too. Tr. 13–14. Prandy–Binett showed Centrella the contents of his bag, which contained, among other things, a small, purple, paper sack that looked like a "miniature shopping bag with handles." Prandy–Binett told Centrella that the purple sack was a gift. Tr. 15–16, 17. Centrella testified that as soon as he noticed

duct tape on the portion of the package protruding from the shopping bag, he told Prandy–Binett that he was under arrest and removed a duct-taped package from Prandy–Binett's tote bag. Tr. 16–17. Centrella then took Prandy–Binett to the police station, where the duct-taped package was cut open and "field" tested. Tr. 20, 38–39.

Although he was questioned closely at the suppression hearing, Centrella would not say precisely how much of the package he saw before he arrested Prandy–Binett. Twice, he testified only that he saw "a portion" of a package wrapped in silver duct tape. Tr. 16, 18. Detective Huffman, who stood behind Centrella while Prandy–Binett showed Centrella the contents of his bag, testified that he also saw the purple sack, but Huffman did not testify that he saw the entire package within the sack before Prandy–Binett was arrested. Tr. 48.

The trial judge sought to determine whether Detective Centrella's glimpse of a portion of the duct-taped package gave him probable cause to arrest Prandy–Binett. The Government's expert witness, Officer Stroud, testified that if he saw a person walking through a train station holding a duct-taped package in plain view that looked like a kilo brick, he would interview the person, but would not arrest him until after he had investigated the package further. Tr. 84–86. Similarly, Detective Huffman testified that, if he had seen a person walking through a train station with a package like the one found in Prandy–Binett's bag, he would "certainly come up and do an investigation"; however, he responded "No" when asked whether he would arrest a person holding such a package. Tr. 48–49. Only Detective Centrella insisted that, upon seeing a *portion* of a package with duct tape on it, he had probable cause to arrest Prandy–Binett. Tr. 21.

On the evidence at hand, the trial judge ruled that the police "overreached by placing the defendant under arrest at the time they did." *United States v. Prandy–Binnet,* 774 F.Supp. 25, 29 (D.D.C.1991). The judge noted that the testimony of the Government's expert, Officer Stroud, was particularly compelling, because Stroud testified that he would not have made an immediate arrest

even if he had seen an entire brick-shaped package wrapped in duct tape. *Id.* at 28.

Against this factual backdrop, the majority now concludes that Detective Centrella, at the moment he glimpsed a "portion" of a package wrapped in duct tape in the purple sack in Prandy–Binett's bag, had evidence " 'sufficient ... to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). This judgment, I think, is devoid of reason and common sense.

In order to reach the conclusion that Prandy–Binett was legally arrested, the majority purports to examine so-called "conditional probabilities," as if to suggest that there is some mathematical equation that justifies the officers' arrest. But, stripped of the fancy label, the discussion of conditional probabilities is nothing more than gobbledy-gook that in no way obscures the sad truths in this case.

This case is about the significance of duct tape, and whether its mere appearance on a portion of an unidentified package gives rise to probable cause. Prior to seeing the duct tape, Detective Centrella was pursuing blind hunches—he never suggested that he had anything approaching probable cause before he saw the duct tape. His decision to arrest was based solely on the sight of duct tape ("As soon as I saw it, I told [Prandy–Binett] he was under arrest...." Tr. 16–17. "As soon as I saw that, in my mind, that's drugs." Tr. 19).

It is totally disingenuous for the majority to suggest that this case involves anything more than duct tape. For example, there is no basis whatsoever for the court to credit Detective Centrella's testimony that he became "suspicious" of Prandy–Binett based on his responses during their interview.[3] Centrella claimed that he became suspicious because Prandy–Binett had said that he was coming from New Jersey, but his train ticket showed that he had boarded the train in New York; he had said that he worked in New Jersey and lived in Washington, but the address on his driver's license was in Maryland; and he had said that he had been in New Jersey for one week, but was only carrying a small tote bag that did not look very full. Tr. 12–13. Nothing in these answers would increase the probable accuracy of Centrella's suspicion that Prandy–Binett was committing a crime. Given the metropolitan nature of the Washington and New York areas, it is hardly inconsistent or even unusual for someone to say that he lives in Washington, but to have a Maryland address and driver's license; or to say that he was travelling from New Jersey, but to have boarded the train in New York. Nor is there anything unusual about living in one town and working in another, or in carrying a small bag when one has been out of town for a week—especially if one is poor.[4]

This is not even a case in which the defendant failed to cooperate with the police. He produced a train ticket and a driver's license when asked, and displayed the contents of his bag for inspection. Nor was there testimony that Prandy–Binett acted or appeared nervous during his interview with the police. Thus, Centrella had no verifiable evidence that Prandy–Binett had given false stories

**3.** It is well known, by now, that the police will cite virtually *any* circumstance noted prior to arrest or a *Terry*-stop in order to justify the defendant's detention. *See United States v. Hooper,* 935 F.2d 484, 499–500 (2d Cir.) (Pratt, J., dissenting), *cert. denied,* —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991) (listing cases and examples). However, there is no proof that these recited factors are actually the factors that motivated the police to investigate and detain the defendant. *Cf.* Morgan Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Profiles,* 65 B.U.L.Rev. 843, 884–921 (1985) (showing empiri-

cally that drug courier characteristics appearing in the caselaw are not actually relied upon by the police doing interdiction work).

**4.** The majority also finds suspicious the "incongruity" of the sight of a "crudely wrapped block inside the fancy perfume bag." Such comment reveals a distinct lack of empathy for some members of our society—those without much disposable income, for example—who readily find use for a discarded shopping bag and who might very well wrap a gift with whatever packaging material is on hand, including duct tape.

about his identity, where he had been for the past week or his trip to Union Station, and no evidence at all that he was attempting to be deceptive with his answers to Centrella's questions. It is therefore absurd to suggest that Prandy–Binett's behavior or answers were somehow suspicious or inconsistent, and thus increased the probable accuracy of the suspicion that he was committing a crime.

In the end analysis, the majority's finding of probable cause must rest, if anywhere, on Detective Centrella's glimpse of a duct-taped package in Prandy–Binett's bag. The holding on this score is unfathomable. First, it is simply wrong to conclude that Detective Centrella knew, or could justifiably infer, that he had seen a kilo-sized package wrapped in duct tape inside Prandy–Binett's bag before he arrested Prandy–Binett. The District Court specifically found

> that Officer Centrella saw a portion of a square object wrapped in silver duct tape. He did not touch the object, nor did he view the whole object at that time. Indeed, testimony of the two arresting officers differed significantly on the size of the object.

*Prandy–Binett,* 774 F.Supp. at 27. These findings of fact are not clearly erroneous, and so they are binding on this court. *United States v. Holder,* 990 F.2d 1327, 1328 (D.C.Cir.1993). The majority, however, simply ignores the findings of the trial court and reviews the entire record *de novo.*

In any event, the record is absolutely clear that the detectives saw nothing more than a *portion* of an unidentified package. A "portion" of a package does not reveal the full dimensions of the package, and without that information, one cannot reasonably infer the "bulk" of the package. Neither officer testified at the suppression hearing that they inferred the "bulk" of the package from their glimpse of the duct tape. Thus, the majority's discussion of "bulk" is constructed from whole cloth. Further, neither officer saw enough of the package to know whether it was completely wrapped in duct tape, or in duct tape over plastic, or in some other configuration. For all they knew, the package could have had duct tape covering one corner or side, like a patch.

Even assuming, *arguendo,* that Detectives Centrella and Huffman had seen the entire package before arresting Prandy–Binett, it would still be absurd (indeed, contrary to the Fourth Amendment) to suggest that an officer's observation of a brick-shaped package wrapped in duct tape *alone* provides probable cause for *arrest.* A duct-taped, brick-shaped package is not the sort of single-purpose container that "so clearly announce[s] its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer." *Robbins v. California,* 453 U.S. 420, 428, 101 S.Ct. 2841, 2846, 69 L.Ed.2d 744 (1981) (plurality opinion of Stewart, J.); *see also Arkansas v. Sanders,* 442 U.S. 753, 764–65 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979) (noting that the contents of some containers, like a kit of burglar tools or a gun case, can be inferred from the outward appearance of the container). Duct tape is opaque, and thus the contents of a duct-taped package are concealed from an observer's view. The brick-like shape of a package might provide the observer with a general hint about the size of its contents, but the shape of such a package is too generic to make reasonable the inference that the contents of the package are also brick-shaped. *See United States v. Cardona–Rivera,* 904 F.2d 1149, 1154, 1156 (7th Cir.1990) (opining that a glass container or a Maltese Falcon wrapped in contour-hugging material might be single-purpose containers, but that "a wrapped brick of cocaine does not necessarily proclaim its contents so unequivocally as to justify a search without a warrant"); *United States v. Barrios–Moriera,* 872 F.2d 12, 13, 17 (2d Cir.) (noting that "[w]e do not mean to suggest that the mere viewing and evaluation of the package alone constituted probable cause," when officer arrested suspect carrying a "rectangular object wrapped in tape"), *cert. denied,* 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989).

Of course, an officer is entitled to rely on his knowledge of and experience with distinctive drug packaging when making arrests. *Texas v. Brown,* 460 U.S. 730, 742–43, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion of Rehnquist, J.). However,

the Supreme Court has never held that an officer's glimpse of a packaging material known to be used in the drug trade *alone* provides that officer with probable cause to arrest. Instead, the Court made clear in *Texas v. Brown* that an officer's observation of distinctive packaging, *combined with* his observation of other incriminating evidence, gave the officer probable cause to arrest. *Id.* at 734, 743, 103 S.Ct. at 1539, 1543 (the officer's observation of small plastic vials, an open bag of party balloons and quantities of loose, white powder in the defendant's glove compartment, in addition to his observation of a balloon in the defendant's hand, gave officer probable cause to arrest).

Notably lacking in this case are other incriminating or suspicious circumstances that would reasonably have added to the suspicions of the arresting officers. For example, the officers did not see other evidence of drug paraphernalia, or white powder, in Prandy–Binett's bag or on his person. *See, e.g., Texas v. Brown*, 460 U.S. at 734, 743, 103 S.Ct. at 1539, 1543; *United States v. Russell*, 655 F.2d 1261, 1262–63 (D.C.Cir. 1981), *vacated in part*, 670 F.2d 323, *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982). Prandy–Binett was not under surveillance for connection with a narcotics-related crime, had not been observed associating with suspected drug dealers, and was not stopped in a location for which the officers possessed a general search warrant for narcotics. *See, e.g., Cardona–Rivera*, 904 F.2d at 1151–52, 1154; *Barrios–Moriera*, 872 F.2d at 13, 18; *United States v. Thornton*, 733 F.2d 121, 123, 128 (D.C.Cir.1984). No testimony was offered that Prandy–Binett appeared nervous, or exhibited the behavior of an individual currently using drugs. *See, e.g., United States v. Moreno*, 897 F.2d 26, 28–29, 31 (2d Cir.), *cert. denied*, 497 U.S. 1009, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990);

*United States v. Brown*, 463 F.2d 949, 950–51 (D.C.Cir.1972). Nor was there anything inherently unusual about the location of the package that could reasonably have added to Detective Centrella's suspicions. It was not concealed under the front seat of a car, nor taped or affixed to Prandy–Binett's body. *See, e.g., Cardona–Rivera*, 904 F.2d at 1152, 1154 (under front seat of car); *United States v. Aguiar*, 825 F.2d 39, 40, 41 (4th Cir.) (bulge at defendant's ankle), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987); *United States v. Lehmann*, 798 F.2d 692, 693, 694 (4th Cir.1986) (book-shaped bulge in defendant's crotch); *United States v. Pace*, 709 F.Supp. 948, 951, 956 (C.D.Cal. 1989), *aff'd*, 893 F.2d 1103, 1104 (9th Cir. 1990) (per curiam) (brick-shaped bulges on defendant's back). Instead, the package was contained in a small paper sack within Prandy–Binett's bag, which is an entirely reasonable place to carry a package.

Probable cause is a fact-based and circumstance-specific determination in which the credibility of the witnesses necessarily plays a role in the trial court's evaluation of the evidence. The trial judge took an active role in questioning the police officers at the suppression hearing, and explicitly credited Officer Stroud's testimony that "the proper approach would have be[en] to investigate further, not to immediately arrest the defendant." *Prandy–Binett*, 774 F.Supp. at 28. The majority, however, tries in vain to minimize the testimony of the Government's expert and totally disregards the credibility finding of the trial judge. This makes no sense to me, for the trial judge was in a far better position to evaluate the testimony given. In a case like this, the appellate court has no business second-guessing judgments of the District Court that are founded on credibility.[5]

---

**5.** In this circuit, we characterize probable cause as a mixed question of law and fact. *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C.Cir. 1992). "We review *de novo* the district court's legal conclusion that probable cause supported the arrest, but we examine the court's findings of fact only for clear error." *United States v. Holder*, 990 F.2d 1327, 1328 (D.C.Cir.1993). In addition, the appellate court is bound to give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." Fed.

R.Civ.P. 52(a). Although it may be difficult in this case to distinguish the District Court's credibility determination from its legal conclusion on probable cause, this is no reason for the court to totally disregard the trial court's credibility findings.

*Cf. United States v. Patino*, 649 F.2d 724, 728 (9th Cir.1981) (noting that, in seizure cases, "[p]roper deference must be given to the district judge who heard the testimony of the officer, his

On the day he was arrested, Prandy–Binett's behavior was consistent with the behavior of "a very large category of presumably innocent travelers." *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam). The duct-taped package in his bag was far from sufficient to subject him to immediate arrest. The judgment of the District Court suppressing the evidence should be affirmed. The decision of the majority to the contrary is a travesty.

tone of voice and inflection, and who observed the officer's conduct on the stand, his appearance and mannerisms").